Labamoee, Judge,
delivered the opinion of the court:
This is an action brought by plaintiffs to recover damages for the alleged breach of a contract.
Plaintiffs were selected, under a procedure established by the Department of the Army, to negotiate a lease with the Secretary of the Army, for a portion of the reservation at Camp Kilmer, New Jersey. The negotiations on behalf of plaintiffs were conducted by a Mr. Powell, who will at times hereinafter be referred to as plaintiff. The facts are sufficiently set forth later in the opinion.
*232 Plaintiffs urge that the defendant’s selection of plaintiffs as the prospective lessee created a contract between the parties, and in the alternative that if no specific contract was entered into, there was an implied contract between the parties and that the refusal of the Secretary of the Army to go forward constituted a breach thereof.
In this posture the question to be answered is whether or not there was an express or implied contract entered into between the parties.
In 1948 there was an acute housing shortage at not only this but at many military establishments in the United States. In September of 1948 the Adjutant General, on behalf of the Secretary of the Army, addressed a letter to the commanding generals of all armies in which the problem of lack of housing was discussed. It was pointed out in that connection that:
* * * Under the provisions of Public Law 364, 80th Congress, however, the outleasing, on a firm basis, for a long term, of a portion of a reservation is permissible when such action has been determined by the Secretary of the Army to be necessary for National Defense or in the public interest. The policy of the Department of the Army is to go as far as it can legally, and in good faith, in using this provision as an inducement in cases where it is feasible to locate the proposed developments on military reservations.
Pursuant to the policy above outlined, the defendant established a procedure to be followed, in which it provided that the applicant would submit its proposal to the commander of the military installation where the housing was to be built. The proposal was to be reviewed and sent to the Army commander of that district. After that, the commander should select the prospective lessee and a lease should be negotiated by the division engineer and the selected applicant. The procedure further established that informal FUA concurrence in the lease should be obtained and draft of the lease sent to higher authority for approval and execution.
On January 27, 1949, plaintiffs’ principals submitted to defendant their written proposal to design, construct, finance, operate, and manage the housing project at Camp Kilmer, New Jersey, to be known as Kilmer Village. The proposal letter enclosing preliminary drawings stated:
*233 We respectfully submit for your consideration two sets of preliminary drawings and proposals covering garden apartment development to be known as “Kilmer Village” on the East side of Plainfield Avenue, opposite Camp Kilmer, in Piscataway Township, Middlesex County, New Jersey.
This submission follows my several previous conferences with Colonel Davies and Major Townsley at the site in connection with need for additional housing facilities for your officers, noncommissioned officers, enlisted and civilian personnel at Camp Kilmer, plus the tremendous demand for dwellings by the general public in that area. It is my understanding that both the Department of the Army and the Federal Housing Administration have approved in principle the proposal of long-term leases of such surplus sites to private industry for the construction of garden apartments or single family homes for rental or purchase. _
_ As a present Colonel of Engineers in the Reserve and former Chief of Real Estate Management and Disposal in the North Atlantic Division Engineers, and with considerable national experience in real estate, housing and mortgage matters, I am thoroughly familiar with the general situation, requirements and procedure. As a former real estate and mortgage official for several of the largest life insurance companies, and present housing consultant to industry in the Raritan Valley area, and with over thirty-five years’ experience in the construction fields, I am submitting this preliminary proposal for myself and associates. Mr. Convery, one of my associates, has been a practicing architect for over thirty years, is a past official of the FHA, and is generally considered well qualified in housing planning and development.
We proposed to plan, construct and manage — “Kilmer Village”- — and will pursue this matter most diligently, looking toward approval from all sources in order that construction may be started as soon as possible so that apartments may be available for renting and occupancy as early as possible. This is a preliminary submission. We propose to submit further details and complete data, including layouts, floor elevations, rental schedules and operating costs as soon as possible.
There followed correspondence between the assistant chief of engineers and the division engineer on the subject. A “specimen lease” was drawn which plainly stated that the lease was to be made between the Secretary of the Army, *234 representing the United States, and the successful lessee. There followed additional correspondence between plaintiffs and defendant, which is set forth in detail in the findings of fact adopted by the court, and on April 1, 1949, Lt. Col. Fischer, for the district engineer, wrote the following letter to plaintiffs:
Reference is made to proposal submitted by you for the development of a garden apartment project to be erected on Government-owned land to be leased to you for that purpose at Camp Kilmer, N. J.
As indicated in conference you attended at this office on 4 March 1949, you have been selected by the Department of the Army and your proposal approved in principle for the purpose of providing privately owned family housing for Army use at Camp Kilmer, N. J. As indicated in telephone conversations between yourself and Mr. D. S. Tooley of this office, representatives of this office are prepared to continue negotiations for a lease of the land necessary for the above mentioned project.
In the meantime there is inclosed herewith for your information and study a revised draft of the proposed lease. Your comments on the inclosed draft of lease are requested together with advice from you as to when it will be convenient to resume negotiations.
All the statements contained in the proposal letter and the ensuing conversations and correspondence, including the letter from Lt. Col. Fischer quoted above, were merely preliminary negotiations as to what plaintiff’s associates would do at Camp Kilmer, providing a lease for the land could be negotiated with the Secretary of the Army, and provided mortgage insurance could be obtained from FHA. This was all known and understood by Powell, who was well acquainted with Army real estate management and disposal proceedings as is evidenced by the letter of January 5, 1949, heretofore quoted. Nor was there any intention expressed by the Army in any of its correspondence that it considered the proposal of plaintiffs as having been accepted. In fact, on March 4, 1949, in a meeting between Mr. Powell and Lt. Col. Fischer in the New York district engineer’s office, the meaning of the selection of plaintiff as “sponsor” was explained as meaning only that the district engineer would negotiate for a lease only with Powell associates, not with *235 any other applicant, and that when the lease had been negotiated in a form satisfactory to the district engineer’s office, it would be forwarded through channels with the recommendation for ultimate execution by the Secretary of the Army. Thus, it was not only the intention of the Army to convey the information but so understood by plaintiff that only the Secretary of the Army had authority to contract. Certainly under these circumstances there was no firm offer by plaintiffs and no acceptance by defendant.
Furthermore, plaintiff was aware at the time that only the Secretary of the Army could enter into a lease and that was the limit of his authority. In other words, the Secretary at that time had no authority to contract directly for the construction of family housing. The representatives of defendant could only negotiate a lease which was subject to the approval of the Secretary of the Army.
No lease was ever signed by the Secretary of the Army. As a matter of fact, there came a time when the Secretary refused to approve the lease for the reason that Camp Kilmer was scheduled for deactivation. It was pointed out at the time of refusal to approve that:
1. As Camp Kilmer, New Jersey, is scheduled to be placed in an inactive status during this Fiscal Year, it is pointed out that military personnel would be required under the lease to supply utilities, sewage disposal, police protection and other incidental proprietory duties after such inactivation unless other arrangements are made or the lease amended.
2. Prior housing agreements of this type were basically and fundamentally authorized because of the urgency for military housing at the posts involved and, further, were authorized at military establishments which were reasonably forecast as being permanent. In the instant case, it would appear that at such time as the housing would be completed it would be primarily, if not totally, a civilian housing project with the military interests being only for an indefinite future, that is, if and when emergency conditions arose which would necessitate the reactivation of this post.
3. In view of the above, it is considered inappropriate at this time to execute the Camp Kilmer, New Jersey, military housing agreements and, therefore, they are returned without action.
*236 Under these circumstances there would be no breach of the contract by the failure of the Secretary of the Army to sign the lease. No formal contract was ever consummated which could have been breached. -
The question then remaining is whether or not the various negotiations and proposals constituted an implied contract.
All the evidence in the case points to the fact that the negotiations were preliminary and primarily for the purpose of entering into a lease for building sites in the Government-owned Camp Kilmer. Nothing could or would be done until the lease was agreed upon and signed by the parties. This was known to plaintiffs and certainly was the intention of the defendant. The intention of the defendant is further evidenced by its willingness to further negotiate a lease even after deactivation of the camp. This offer was made in good faith by the defendant in view of the time and money spent by plaintiffs. However, plaintiffs refused to further negotiate. Thus we think it clear that no contract can be implied from the circumstances surrounding the transaction. It is probably the rule rather than the exception that money is spent and not recovered in circumstances where a contract is not consummated. The fact that plaintiffs lost money is not enough.
The Kilmer Village project was largely the product of the imagination of plaintiffs. Plaintiffs not only developed the idea, but drew the plans and progressed to the point that only plaintiffs were to be recognized in negotiations for a lease. It is also true that had Camp Kilmer not been deactivated by the Army, plaintiffs would undoubtedly have been awarded the contract. Almost all their proposals had been agreed upon and accepted by the Army. However, in the absence of final acceptance by the Secretary of the Army, we do not feel that the efforts and negotiations by plaintiffs ripened into a contract.
There being no contract, either express or implied between the parties, this court cannot grant recovery under the Tucker Act, 28 U. S. C. 1491. Cf. United States v. Minnesota Mutual Investment Company, 271 U. S. 212, 217; Goodyear Tire & Rubber Company v. United States, 276 U. S. 287, 293.
*237 Plaintiffs’ petition is dismissed.
It is so ordered.
Madden, Judge; Whitaker, Judge; Littleton, Judge; and Jones, Chief Judge, concur.
findings of fact
The court, having considered the evidence, the report of Commissioner Roald A. Hogenson, and the briefs and argument of counsel, makes findings of fact as follows:
1. Plaintiffs, Kilmer Village Corporation, Kilmer Village Project 2 Corporation, Kilmer Village Project 3 Corporation, are New Jersey corporations, organized in April 1949, by J. Kingsley Powell, Neil J. Convery, and J. Anthony Probst, principal stockholders, for the purpose of negotiating leases and consummating agreements with the defendant, by and through its Department of the Army, for the construction, ownership, and operation of a multiple-unit garden-type apartment housing project on land comprising part of defendant’s Camp Kilmer, New Jersey. Negotiations between the incorporators and defendant’s representatives had previously commenced and been carried on from December 1948.
2. About December 15, 1948, Mr. Powell learned from newspaper reports and from a circular letter issued by the National Association of Real Estate Boards that the Army was proposing to lease property at military establishments throughout the country for the purpose of having private enterprise construct, own, manage, maintain, and operate rental housing for the use of Army military and civilian personnel.
Mr. Powell was aware that the outleasing of Government-owned property by the Department of the Army had not been previously permitted. From 1942 to 1946 Mr. Powell had been on active duty as a Lieutenant Colonel, Corps of Engineers, serving from 1942 to 1944 as Executive Officer at Belle Mead ASF Depot, and from 1944 to 1946, as Chief, Real Estate Management and Disposal Section, North Atlantic Division, Corps of Engineers, covering New York, New Jersey, and Delaware, with offices at New York City. *238 In connection with the negotiations pertinent to this case, Mr. Powell dealt with Army personnel, many of whom he had previously known during his Army service. Mr. Powell was familiar with the general leasing authority of the Secretary of the Army.
Mr. Powell had graduated with a Bachelor of Science degree in Civil Engineering from Rutgers University, New Brunswick, New Jersey, in 1917. With the exception of his time of service as an infantry captain in World War I, he had been employed in general construction work from 1911 to 1921 as foreman, estimator, field engineer, assistant superintendent, and superintendent of construction. In 1921 and 1922 he had participated as a partner in the operation of a general contracting business under the name of Martin & Powell.
Mr. Powell became a licensed real estate broker in New Jersey in 1921 and thereafter engaged in the real estate business throughout that state, but mainly in the Raritan Valley area surrounding New Brunswick, which city was three miles from Camp Kilmer. In 1927 and 1931, he was respectively vice-president and president of the New Jersey Association of Real Estate Boards, and since 1925 was active nationally and locally in real estate organizations. He had served as appraiser and mortgage supervisor in New Jersey for various life insurance companies and banks, and also as real estate adviser and consultant for the City of New Brunswick. In 1946 and 1947 he was retained as a consultant by various industrial concerns in the Raritan Valley to assist them in providing adequate housing for employees.
3. The change in the Department of the Army policy regarding outleasing of Government-owned property resulted from a nation-wide housing shortage, which was particularly acute at many military establishments. The Army never proposed to finance the construction of any housing, but in 1948 undertook to determine whether private capital could be attracted for construction of housing facilities on Government-owned property at military installations. Representatives of large financial institutions, such as insurance companies, were called into conferences by the Army. They indicated that their organizations were not interested in being *239 owners of rental bousing located on land leased from the Government, but might be interested as mortgagees if the Federal Housing Administration would consent to insure the mortgages under section 608 of the National Housing Act.
4. Under date of September 21,1948, the Adjutant Genera] of the Department of the Army, Washington, D. C., Major General Edward F. Witsell, acting by order of and in behalf of the Secretary of the Army, executed and forwarded the following circular letter, bearing the subject heading “Provision of Family Housing by Private Enterprise for Army Use”, to the Commanding Generals of all Armies, Zone of Interior, and also to the chiefs of the technical services, including among others, the Corps of Engineers:
1. The deficit in family housing required for military personnel entitled to quarters and for such civilian employees as circumstances dictate be furnished quarters by the Army is so great that there is no hope that it can be met satisfactorily through the medium of direct military appropriations alone so long as the requirement remains at the present level.
2. The Assistant Secretary of the Army recently sponsored a conference to determine the possibility of interesting private capital in a widespread program of building and operating rental properties at or near Army installations for use by Army personnel. Several of the large insurance companies were represented at the conference. The consensus of these representatives was that it is impractical to attack this problem as a general one on a countrywide scale, but that the proper approach would be to work out individual solutions for each area. It was suggested that local real estate promoters and local construction contractors, who by reason of their acquaintance with local conditions are in the best position to build economically in their own area, be approached with a view to enlisting their aid in solving the problem.
3. It is desired that you initiate action with a view to obtaining the construction of rental properties by private capital on or near military installations (including Class II installations) for use by Army personnel. The Administrator of the Housing and Home Finance Agency, the Commissioner of the Federal Housing Administration and representatives of private enterprise have been queried as to the best procedure to use in making initial contacts with local interests have recom *240 mended: That a conference be sponsored near each installation at which it appears practical for private enterprise to construct family quarters for use of Army personnel: That the local Army Advisory Committee be invited to take part in the conference: That the local representatives of the Federal Housing Administration be requested to take part in the conference and further that they be requested to furnish the names of representatives of real estate boards, local builders associations, (such as the Master Builders’ Association and the National Association of Home Builders) and any other individuals or groups whose representation at the conference would be desirable; and that the various Armies conduct the conference on the highest level within each Army that the then existing circumstances permit.
4. There are admittedly many difficulties attendant upon such an undertaking, probably the greatest of which is the difficulty of offering any tangible return for the special consideration in assignment of units which the Army desires. Under the provisions of Public Law 364, 80th Congress, however, the outleasing, on a firm basis, for a long term, of a portion of a reservation is Eermissible when such action has been determined by the ecretary of the Army to be necessary for National Defense or in the public interest. The policy of the Department of the Army is to go as far as it can legally, and in good faith, in using this provision as an inducement in cases where it is feasible to locate the proposed developments on military reservations. (See Inclosure No. 1.)
5. Public Law 901, 80th Congress, 2d Session (the “Housing Act of 1948”), liberalizes and broadens the scope of previously existing legislation as it pertains to Federal mortgage and investment insurance for both rental and owned properties. (See Inclosure No. 2.) The Administrator of the Housing and Home Finance Agency and the Commissioner of the Federal Housing Administration (who administers the insurance phases of the law) have assured the Department of the Army of their desire to cooperate to the fullest extent of their abilities in this matter and are issuing instructions to their field offices (listed in Inclosure No. 3) to give assistance to the Army representatives on call. By reason of the fact that these field representatives must pass on all requests for Federal mortgage or rental insurance, their presence at the above mentioned conferences and their active support of the Army’s proposal should lend material weight to it, and while the Department of the Army cannot tangibly influence the action by the Fed *241 eral Housing Administration on any applications, it can and will lend its moral support to applications for insurance for sound projects to be used principally for Army personnel.
6. To receive approval by the Federal Housing Administration the project wili, in the general case, have to be located in or near an urban area, so that in event the requirement from the Army installation were materially reduced or eliminated there would still be a market for the housing.
7. The information shown in Inclosure No. 4 is being furnished to the Administrator of the Housing and Home Finance Agency and the Commissioner of the Federal Housing Administration to indicate the seriousness of the Army’s family housing shortage in localities where it appears that the construction of such housing could be undertaken by private capital without undue risk. It is not to be construed as limiting investigation at any other locality which shows promise.
8. This problem is one of the most serious of those now facing the Army and every effort must be exerted in its solution.
5. The circular letter set forth in finding 4 was prepared by Colonel William W. Lapsley, Assistant Chief of the Installation Branch, Office of the Director of Logistics, General Staff, United States Army, Pentagon, Washington, D. C. Colonel Lapsley had been and continued to be assigned by the chief of his branch at all times pertinent to this case to the development of the procedures and program of obtaining privately owned housing on military installations.
Camp Kilmer was within the jurisdictional area of the First Army, and the chain of command was from the Commanding General, First Army, Governors Island, N. Y., to the Commanding General, New York Port of Embarkation, Brooklyn, New York (sometimes called Brooklyn Army Base) to the Commanding Officer, Camp Kilmer.
The pertinent chain of command within the Corps of Engineers was from the Chief of Engineers, Washington, D. C., to the North Atlantic Division Engineers, with headquarters at New York City, to the New York District Engineer Office.
The procedure required for selection of a sponsor for a housing project on Camp Kilmer was submission of the pro- *242 posáis of applicants to the Commanding Officer of Kilmer, who, after review, submitted them with recommendations to the Commanding General, New York Port of Embarkation, who in turn made a review and submitted recommendations to the Commanding General, First Army, who was authorized to make the selection of the sponsor.
The established procedure was that the successful applicant would undertake the negotiation of a lease for the Government-owned land with the New York District Engineer. When the lease had been signed by the applicant in a form acceptable to the District Engineer, it was to be forwarded through channels to the Commanding General, First Army, who would in turn submit the entire matter for review by the Chief of Engineers, the Director of Logistics, and the Judge Advocate General, before final submission of the lease to the Secretary of the Army for consideration and execution in behalf of the defendant. The question of availability of the particular land for outleasing on the ground that it was not needed for military purposes was to be processed through the above-outlined chain of command of the Corps of Engineers from the District Engineer to the Chief of Engineers and then submitted to the Secretary of the Army for his determination.
6. Under date of December 2,1948, Major General Witsell acting by order of and in behalf of the Secretary of the Army, executed and forwarded the following circular letter to the Commanding Generals of all Armies, Zone of Interior, and also to the chiefs of the technical services, including the Corps of Engineers, on the subject of “Provision of Family Quarters by Private Enterprise for Army Use”:
1. Deference is made to letter, Department of the Army (AGAO-S 620 (14 Sep 48) CSGSP-M), 21 September 48, subject: Provision of Family Housing by Private Enterprise for Army Use. Any leases authorizing the use of real estate under the jurisdiction of the Army for use by private enterprise in connection with the program outlined by the letter referred to above must be negotiated by the Corps of Engineers in accordance with AE 100-62 and PE 7A-401, as changed. Appropriate Division or District Engineers should be invited to have representatives present at conferences at which the leasing of Government real estate will be discussed.
*243 2. The Chief of Engineers is drafting a basic lease form to be used ás a guide in negotiating leases for Government real estate to be used by private enterprise in building quarters, and will distribute it to Division and District Engineers at such time as it has received Federal Housing Administration approval.
7. Upon learning in December 1948 of the proposed program of construction of housing at military installations, Mr. Powell went to the Headquarters, North Atlantic Division, Corps of Engineers, New York, where he was provided with the general information available as to the new policy of outleasing of military property, and shown a list of military installations in need of housing, including Camp Kil-mer, Fort Dix, Fort Monmouth, Mitchell Field, Steward Field, and Eome Air Base. Over the next six months, Mr. Powell personally interviewed the Commanding Officer of each of these installations, as it was suggested by the Division Engineer’s Office that negotiations should commence at the installation concerned with each proposed housing project.
On December 22, 1948, Mr. Powell called on Col. B. F. Hayford, Commanding Officer, Camp Kilmer. Mr. Powell was particularly interested in Kilmer because of the housing shortage in the area shown by a special survey he had conducted for his industrial clients in 1946 and 1947. Colonel Hayford immediately called in his executive officer and his post engineers who pointed out on a Kilmer map a 93-acre tract of land, known as the 2100 area, which was suitable for construction of a housing project. This site was a part of Camp Kilmer but immediately across the public highway from the main gate and installations and other areas thereof. .This tract had at some previous time been used for construction and maintenance of an encampment for prisoners of war, and roads, water and sewer lines still existed thereon. Mr. Powell was provided with post engineer’s maps of the area.
There was an urgent need for housing for' military and civilian personnel of Camp Kilmer.
8. On January 5,1949, Mr. Powell submitted the following written preliminary proposal to the Commanding Officer, Camp Kilmer:
We respectfully submit for your consideration two sets of preliminary drawings and proposals covering *244 garden apartment development to be known as “Kilmer Village” on the East side of Plainfield Avenue, opposite Camp Kilmer, in Piseataway Township, Middlesex County, New Jersey.
This submission follows my several previous conferences with Colonel Davies and Major Townsley at the site in connection with need for additional housing facilities for your officers, noncommissioned officers, enlisted and civilian personnel at Camp Kilmer, plus the tremendous demand for dwellings by the general public in that area. It is my understanding that both the Department of the Army and the Federal Housing Administration have approved in principle the proposal of long-term leases of such surplus sites to private industry for the construction of garden apartments or single family homes for rental or purchase.
As a present Colonel of Engineers in the Keserve and former Chief of Keal Estate Management and Disposal in the North Atlantic Division Engineers, and with considerable national experience in real estate, housing and mortgage matters, I am thoroughly familiar with the general situation, requirements and procedure. As a former real estate and mortgage official for several of the largest life insurance companies, and present housing consultant to industry in the Baritan Valley area, and with over thirty-five years’ experience in the construction fields, I am submitting this preliminary proposal for myself and associates. Mr. Convery, one of my associates, has been a practicing architect for over thirty years, is a past official of the FHA, and is generally considered well qualified in housing planning and development.
We proposed to plan, construct and manage — “Kilmer Village” — and will pursue this matter most diligently, looking toward approval from all sources in order that construction may be started as soon as possible so that apartments may be available for renting and occupancy as early as possible. This is a preliminary submission. We propose to submit further details and complete data, including layouts, floor elevations, rental schedules and operating costs as soon as possible.
This proposal was written on the letterhead of The J. K. Powell Company, under which name Mr. Powell was operating his real estate business.
9. Prior to the submission of this proposal, Mr. Powell in the latter part of December 1948 had approached Mr. Con-very who agreed to and did participate in the preparation of *245 this proposal and subsequent submissions, and also engaged in later negotiations concerning the Camp Kilmer housing project.
Mr. Convery was an architect with offices in Newark, New Jersey, actively engaged in' the general practice of architecture, having been licensed in New Jersey in 1918. Mr. Con-very had returned to private practice in June 1948, after a period of public experience, during which he served for 3y2 years as chief architect, New Jersey Office, Federal Housing Administration; for 4 years as executive director and manager of the Newark Housing Authority, when he planned, built and managed 2,400 dwelling units; and from the latter part of World War II to June 1948, as technical director for four states of the National Housing Agency. Prior to his public experience, Mr. Convery had been architect for a number of multiple housing projects constructed in New Jersey. As of about February 1,1949, he had under his direction for ■construction about 1,400 apartment units in northern New Jersey, and had in his office for architectural detail over 1,000 units scattered throughout New Jersey.
10. Under date of January 14,1949, the Assistant Chief of Engineers, Col. W. H. Hastings, acting by order of the Chief of Engineers, addressed a letter to the Division Engineer, North Atlantic Division, Corps of Engineers, New York, N. Y., on the subject of “Provision of Family Housing by Private Enterprise for Army Use.” Paragraphs 2 and 3 of this letter provided:
2. The general procedure to be followed in leasing for the subject purpose will be as follows:
The Army Commander and/or Commanding Officer will select the prospective lessee or lessees with whom he desires a lease to be negotiated. Such selection will usually be the prospect offering the best housing facilities at the most reasonable rental rates to the Army personnel. When notified of the selection, the Division and/or District Engineer will arrange conferences for negotiating the lease. Local officials and representatives of all Army services involved should be requested to attend such negotiations. An informal concurrence of the lease negotiated should be obtained from the local FHA officials. The draft of lease should then be forwarded to this office through the Commanding Officer *246 and the Army Commander for transmittal to higher authority for approval and execution.
3. The present authority under which FHA may insure the mortgages on the proposed projects expires on 31 March 1949. In order to obtain such insurance, the lessee must obtain a committal from FHA prior to that date. In order to obtain such approval, the lessee must furnish the information and papers required by FHA for such purposes, which in these cases will include the executed lease. In view thereof all leases must be executed and delivered to the lessee in sufficient time to permit the FHA to make necessary committals prior to 31 March 1949. The local FEA officials should be contacted to determine the minimum time required for action on such cases. Some FHA officials have indicated that they will attempt to obtain such committals within a period of five or six days. Since time is of the essence and in order to avoid delays in the housing program it is requested that the Army Commands and all Commanding Officers of military installations within your Division be contacted within the next few days to determine whether or not they have contacted any prospective lessees with whom they desire your office to negotiate. Such contracts with the Commanding Officers and Army Commanders should be repeated at regular intervals. After a prospect has been referred to your office by a Commanding Officer or Army Commander, the lease should be negotiated as soon as practicable. Normally the conference should be arranged within two or three days after the prospect has been referred to your office and the draft of lease should be transmitted on the day following the negotiations. Close cooperation must be maintained with the Army Commander and Commanding Officers at all times.
Transmitted with this letter was a form of lease which was a revision of a form previously submitted in December 1948.
Under date of January 18,1949, the Executive Officer of the Corps of Engineers, North Atlantic Division, by order of his Division Engineer, transmitted to the District Engineer, New York District, for “guidance and immediate compliance”, a copy of this January 14 letter of the Chief of Engineers, and also a copy of the revised form of lease.
The lease form was entitled “Specimen Lease” and bore the following instructions on the first page thereof:
*247 This draft lease has been prepared for use as a guide to the probable terms and conditions that will be included in leases granting the use of Department of the Army lands for the construction of privately owned family housing projects for military personnel.
This draft represents an approximation for purposes of negotiation and discussion and does not represent a proposal by the United States Government.
It is furnished as a basis of discussion only, designed to answer many of the questions that have been raised or will be raised by interested parties. The draft has not yet been given final approval and, even if approved as a standard form, it is recognized that modifications may be required when a specific project is under consideration.
This form plainly stated that the lease was to be made between the Secretary of the Army, representing the United States of America, and the successful lessee.
This “specimen lease” form was provided in connection with a communication entitled “Form Lease for Use in Negotiating Leases in Connection With Privately Financed Housing Projects,” dated January 5,1949, issued by order of the Secretary of the Army by Lt. Gen. H. S. Aurand, Director of Logistics, and Lt. Col. Lapsley. This communication, issued to all Zone of the Interior Armies and all technical services, including Corps of Engineers, provided in pertinent part as follows:
1. Eeference is made to letters, Department of the Army (AGAO-S 620 (14 Sept) CSGSP-M), 21 September and (AGAM-PM 620 (23 Nov 1948) CSGLD/ C2), 2 December 1948, subject “Provision of Family Quarters by Private Enterprise for Army Use.” Representatives of the Departments of the Army, Navy, and Air Force have discussed with the Administrator, Housing and Home Finance Administration, and the Commissioner, Federal Housing Administration, the provisions of a lease which the military establishments can give authorizing the use of Federal land for the purpose of constructing thereon privately financed family-type housing projects, the mortgages to be insured under the provisions of the National Housing Act. These discussions principally concerned two major provisions in the proposed lease. The first was the mandatory provision in the leasing act which reserves to the Secretary concerned the right in his discretion, to terminate the lease during a period of National Emergency *248 declared by the President. Federal Housing Administration desired that the lease be drawn without any such provision. However, they have agreed that if such provision is modified to provide that the Department concerned will obligate itself to purchase the lessee’s property at fair market value in the event of the exercise of the right to terminate for this cause, this portion of the lease will not preclude the insurance of mortgages on such leasehold estates. They pointed out, however, that in the case of revocation prior to default under the insured mortgage and prior to transfer of the property to the Federal Housing Administration or assignment of the mortgage to Federal Housing Administration, the mortgagee and sponsor would have to look to the military for payment and no claim could be made against the F. H. A. under the insurance contract since the mortgagee would be unable to comply with the provisions of the contract of insurance. The F. H. A.’s position in this regard is based on statutory limitations so cannot be varied or modified. If, however, default and transfer to the Commissioner take place prior to revocation, F. H. A. has indicated it will make no objection to payment of the insurance by reason of the existence of the right of revocation. This modification is acceptable to the Armed Services. The other point concerned the furnishing of utilities by the Government. F. H. A. desires tliat where a project is dependent for utilities services on Government facilities that the Department involved obligate itself to furnish such services for the duration of the insured mortgage. The Departments cannot do this. They can agree to furnish the services for so long as the installation under consideration remains under military control but not for any definite period. In view of this F. H. A. has indicated that no blanket approval can be given but that each specific case must be judged on its merits. If it can be shown in any case where the use of Government facilities is proposed that alternate sources of utilities can be tapped or developed at reasonable cost F. H. A. has indicated that the lack of a guarantee to furnish utilities for the life of the insured mortgage will not be a bar to approval.
2. The net result of the discussion is that F. H. A. has given approval at the Washington level to accepting a lease containing a modified termination in event of National .Emergency clause, but no blanket approval of the entire lease was given since it is desired that leases for specific projects be negotiated in the field. The Chief of Engineers has distributed a form lease to his field *249 representatives to be used as a basis for negotiation, a copy of this form lease is inclosed. Tbe lease form has been reviewed by F. H. A. and approved as a basis for negotiation. If local F. H. A. officials raise any questions concerning the acceptability of a lease containing condition 14b of the inclosed lease form, it is suggested that they be requested to call Mr. B. C. Bovard, General Counsel of F. H. A.
3. It is desired that action be continued to have individual projects developed and submitted to F. H. A. for approval of mortgage insurance. The Department will use what influence it can in obtaining approval of projects when it is informed of their submission to F. H. A. In this connection it must be emphasized, however, that F. H. A. stated that the legislation under which it operates requires that all projects approved must be determined to be good business risks and that while they are desirous of helping the Armed Services, any consideration of a project in which the Services are interested must necessarily come within the framework of existing legislation.
This communication was marked at the top and bottom in block capitals: “IMMEDIATE ACTION”. Copies were provided to the First Army, the Chief of Engineers, the North Atlantic Division Engineer, and the New York District Engineer.
11. By Special Order No. 68, Department of the Army, dated April 2, 1948, Lt. Col. Harry O. Fischer, Corps of Engineers, was ordered to report for duty to the Office of the District Engineer, New York District, and by Special Order No. E-26, dated August 2, 1948, he was assigned as Executive Officer, New York District. He remained on duty as such Executive Officer thereafter and throughout 1949.
Col. Fischer’s duties as Executive Officer were to be principal assistant to the District Engineer, supervising the administrative activities of the office, making such decisions as might be delegated to him by the District Engineer, and serving as District Engineer in the latter’s absence.
Throughout 1949 Col. W. W. Wanamaker was the New York District Engineer, Corps of Engineers.
By telegram prepared and signed by Col. Fischer, as Executive Officer, New York District, Corps of Engineers, transmitted about January 21, 1949, the Commanding General, *250 First Army, was advised that the Office of the New York District Engineer had been designated as representative of the Chief of Engineers to negotiate all leases in the First Army area in connection with the Department of the Army directives concerning provision of family housing by private enterprise for Army use.
12. By letter dated January 27, 1949, addressed to The J. K. Powell Company, and written by Lt. Col. Reuben Star, Adjutant General of the New York Port of Embarkation, Mr. Powell was advised as follows:
Reference is made to the proposal for family housing at Camp Kilmer which our records show that you expect to submit on or about 27 January 1949.
You are advised that you should take steps to submit your proposal at the earliest possible date, not only because there are other concerns submitting proposals in competition with yours, but also because it is understood that the authority under which FHA may insure mortgages on proposed projects expire 31 March 1949.
Inasmuch as after submission considerable time may still be required to arrange such financing, it should prove to be to your advantage not to delay any longer than absolutely necessary in making your submission.
13. On January 27, 1949, Mr. Powell and Mr, Convery submitted the following formal written proposal to the Commanding Officer, Camp Kilmer:
Following our several recent conferences and as requested, attached are preliminary plans and specifications covering the proposed apartments at “Kilmer Vil- ■ lage.” My associates and I proposed to design, construct, finance, operate, and manage these rental units, and begin operations as soon as all details have been completed.
We have submitted these preliminary drawings and specifications to the Federal Housing Administration at their Newark office where they are now receiving analysis and field appraisal to determine the merits and rent ability. They must be satisfied that there is necessary demand for such apartment rentals in the area, not only from your personnel, but also from the surrounding area and industry.
Preliminary estimates indicate favorable reaction to the construction of about 900 units at first to be followed by additional groups as warranted by the demand.
*251 Based upon securing a long-term land lease at a nominal yearly rental, and securing firm mortgage insurance commitments from the Federal Housing Administration, we believe that the following rental schedule can be set:
3 rooms — LR-BR-K-B_@ $55.00 monthly
3Yz rooms — LR-BR-K-DA-B_@ 65.00 monthly
4 rooms — LR-2BR-K-B-@ 75.00 monthly
4% rooms — LR-2BR-K-DA-B_@ 85.00 monthly
5 rooms — LR-3BR-K-B_@ 95.00 monthly
It is proposed that sanitary sewer service be furnished by using your facilities, that water and electricity and telephone service be secured from existing private utility companies, that fire and police protection be furnished jointly by Camp Kilmer and Piscataway Township. School service will be afforded by the Township at the nearby Fellowship School. Above rentals include heat, water, garbage and refuse disposal. Individual tenants will pay for electricity, gas, and telephone service on an individual metered basis.
It’s our understanding that it will be necessary for you to approve the above proposal, and recommend it through channels, so that a land lease may be negotiated, and the Federal Housing Administration mortgage insurance will be issued. We proposed then to begin operations immediately.
14. Attached to and made part of this proposal of January 27, 1949, were Mr. Convery’s architectural unit plans for five different types of apartment units,, sketch of the finished exterior appearance of one of the typical garden apartment buildings, and site plan showing the location of all apartment units on the proposed “2100” area to be used for the housing project, together with play areas, parking facilities, landscaping, power line, existing and proposed streets, baseball field, swimming pool and tennis courts, walks, trees, shopping center, and picnic area.
Set forth on the site plan was a table or legend showing by reference to appropriate symbols and lines marked on the buildings arranged throughout the project area, the distribution of the five types of apartment units, together with the number of proposed units of each type. The site plan and legend together indicated 1,240 apartment units comprised of 5,100 rooms.
*252 15. Attached to and made part of the January 27, 1949, proposal was an outline specification prepared by Mr. Con-very, as follows:
FOOTINGS: Concrete.
Foundation walls : Masonry. Full cellars under approximately 20% of all buildings, providing laundry, perambulator and storage space for the tenants and meter rooms for utilities.
Upper walls: Colonial brick veneer on wood frame with some exterior wood finish for contrast. _
_ Party walls : Between each dwelling unit walls will be 8" cinder block.
Porches and cornices: Masonry platforms, wood columns, pediments and rails. Some cornices wood, others brick and wood.
Ropes : All roofs to be asphalt shingles, except boiler rooms which will be felt and slag.
Insulation : All roofs throughout to be insulated with high efficiency insulation.
Sash and frames: Wood double hung or steel casement sash throughout. Cellar windows to be steel.
Floor construction : Wood joists.
Partitions : Wood studs.
Finished floors : Oak in Living Room, Dining Room, Bed Rooms, Hall and Closets. Linoleum finished floor in kitchens. Tile floors and wainscot in Bath Rooms.
Wall finish : Rock lath and plaster.
Trim: Painted wood, full metal screens.
Kitchen fixtures : Sink, gas range, electric refrigerator, cabinets below the counter level and wall cabinets above.
Electrical : Flexible conduit — Colonial fixtures.
Plumbing : Brass or copper piping. Built in baths, showers, modern fixtures.
Heating : Vacuum Vapor Heating System, through central heating systems, one boiler room to approximately every 50 families, oil fired steel boilers, cabinet radiation.
Landscaping : As many of existing trees as possible will be saved. Entire plat will be artistically landscaped.
Garages : Individual garages to rear of apartments for approximately 40% of tenants. Parking space for balance.
*253 16. By letter dated February 7, 1949, Mr. Powell submitted a copy of the January 27 proposal and attachments to the Assistant Commissioner, Federal Housing Administration. Previously, he had submitted the preliminary drawings and specifications to the Newark Office of the Federal Housing Administration, and so advised Lt. Col. Star, Adjutant General, New York Port of Embarkation, by letter dated February 1,1949.
17. By letter dated February 7,1949, Col. Hayford, Commanding Officer, Camp Kilmer, forwarded the January 27 proposal of Mr. Powell and Mr. Convery to the Commanding General, New York Port of Embarkation, and stated that The J. K. Powell Company proposed to construct, finance, operate and manage 300 family-type units of two-story garden-type apartments, with expansion to approximately 1,240 units if warranted by future demands.
Col. Hayford stated that a recent study indicated 260 officers, 600 enlisted men, and 300 civilian employees were potential applicants for housing in such a project, that recent correspondence from First Army indicated increase in strength for the Kilmer garrison, and that little doubt existed as to the need for 1,240 units unless the strength of Kilmer were radically reduced. He further advised that the Kilmer housing site was located so that it would be readily available to civilians of the locality should the Army be unable to utilize all of the units.
Col. Hayford recommended favorable consideration of the Powell proposal, and also consideration of any other proposal submitted to him and forwarded prior to February 14, 1949, and concluded his letter with the recommendation that the project be expedited.
By his endorsement on this letter, Major General Ewart G. Plank, Commanding General, New York Port of Embarkation, approved the report and recommendations of Col. Hayford, and forwarded the matter to the Commanding General, First Army, Governors Island, N. Y.
18. In early February 1949 Mr. Convery and Mr. Powell conferred with Mr. Probst and requested him to participate with them in the proposed venture for the construction, *254 ownership and management of Kilmer Village, to which request Mr. Probst agreed.
By letter dated February 16, 1949, Mr. Powell advised Col. D. H. Gillette, Port Engineer, New York Port of Embarkation, that he, Mr. Convery and Mr. Probst proposed to organize corporations to construct, own and manage the housing project at Camp Kilmer. Mr. Powell made reference to the statements of qualifications and experience of himself and Mr. Convery previously submitted, and provided such a statement concerning Mr. Probst. Col. Gillette had been assigned by his commanding officer to receive and file all submissions pertaining to Army housing and in general to correlate all such activities at that level of command.
Mr. Probst was and is a member of the New York Bar, but his main activity for many years was and is as a financier and officer of a number of corporations. He has had 35 years’ experience in the real estate business in the purchasing,, selling, owning, financing and management of real estate properties.
19. After submission of the January 27 proposal, Mr. Powell and his associates contacted and were contacted by various offices of the Army through which the proposal was being processed for the purpose of facilitating consideration of the proposal by all concerned and to keep all parties appraised of developments.
Mr. Powell and his associates also had repeated conferences with Mr. E. S. Whitesell, District Director, Northern New Jersey District, Federal Housing Administration,, Newark, New Jersey, and with members of his staff, concerning procedures and requirements in the processing of' applications for mortgage insurance under section 608 of' the National Housing Act.
20. After submission of the January 27 proposal, four other proposals for construction of housing at Camp Kilmer were received and considered by the various Army offices in the chain of command, and Mr. Powell and his associates were aware of this competition.
21. By letter dated February 9,1949, the Engineer Section,. First Army Headquarters, by command of the Commanding General, First Army, requested the Commanding General, *255 New York Port of Embarkation to forward “all proposals for leased properties” in connection with the Army’s letter of September 21,1948, for “approval and transmittal to the District Engineer, New York District, for further negotiation.” A copy of this letter was forwarded by First Army Headquarters to the District Engineer, New York District, through the Division Engineer, North Atlantic Division.
22. On February 17, 1949, Mr. Powell met with Major General Plank, Commanding General, New York Port of Embarkation, and members of his staff, as well as the Commanding Officer and Post Engineer of Camp Kilmer. This meeting took place at General Plank’s office at the Brooklyn Army Base. Mr. Powell orally outlined the proposal of the Powell associates, which had previously been presented formally through channels. General Plank and the others present examined the formal proposal and attachments, as well as a map of the entire Kilmer post showing the proposed housing site, and discussed the matter in considerable detail. The general plan of procedure met with the approval of General Plank, his staff officers, and other officers present.
General Plank advised Mr. Powell that Camp Kilmer was a temporary post and that, in his opinion, a housing project at Kilmer would be a good investment only to the extent that it might operate if no military personnel were available from Kilmer to occupy the units.
Mr. Powell replied with considerable discussion about existing and potential industrial development of the area about Camp Kilmer.
During this conference General Plank advised Mr. Powell that there were several applications for the leasing of the land at Kilmer for a housing project, and that the selection of the successful applicant would be made by the Commanding General, First Army. General Plank stated that the successful applicant should proceed expeditiously upon the signing of the lease.
23. By letter dated February 28, 1949, Major General Plank recommended to the Commanding General, First Army “that a lease be executed with The J. K. Powell Company for the entire area involved at Camp Kilmer.”
*256 By letter dated February 28,1949, the Division Engineer, North Atlantic Division, New York, N. Y., was instructed by authority of the Commanding General, First Army, as follows:
1. Attached hereto is the proposal of the J. K. Powell Company, 25 Livingston Avenue, New Brunswick, New Jersey, to build three hundred (300) family housing units, to be expanded to approximately one thousand two hundred and forty (1,240) family units if warranted by future military requirements at Camp Kilmer, New Jersey, which proposal is approved in principle by this headquarters.
2. It is requested that the necessary steps be taken to negotiate a lease with the above-named company, which will permit it to proceed with the operations outlined in its proposal.
3. The terms of the lease of the J. K. Powell Company provide the authority to exclude from occupancy any civilians who may be considered undesirable tenants, this provision to be effective if and when the military are unable to keep the apartments filled with military personnel.
This letter listed the names of four other companies which submitted proposals, and further stated that it was not contemplated that further action would be taken with respect to those proposals, and that the listed firms would be so notified.
On the same day by letter stamped “immediate action”, the North Atlantic Division Engineer requested the New York District Engineer “that necessary action be taken immediately” with regard to the application of The J. K. Powell Company for the provision of family housing at Camp Kilmer.
24. On March 1,1949, Col. C. C. Hough, First Army Engineer, advised Mr. Powell by telephone that Powell associates had been selected as sponsor for the Kilmer housing project and that they would hear further from the New York District Engineer regarding negotiation of the lease.
25. By letter dated March 2,1949, Lt. Col. Fischer, Executive Officer, New York District, Corps of Engineers, acting by authority of and in behalf of his District Engineer, advised the Commanding General, New York Port of Embarkation. as follows:
*257 1. This office has received for necessary action and negotiation of a lease, proposal made by the J: K. Powell Company and forwarded by your command to the Commanding General, First Army, by 1st Indorsement dated 9 February 1949, by which Areas 20 and 21 at Camp Kilmer would be made available for non-military purposes.
2. This office is immediately taking necessary steps to accomplish the action desired as expeditiously as possible. In the meantime, however, it is deemed advisable that, in accordance with Department of the Army Special Regulations 210-15-1 dated 26 November 1948 and paragraph 10 of AR 100-62 dated 10 December 1948, the approval of General Staff, U. S. Army, be obtained determining the area involved to be available for nonmilitary purposes. It is the opinion of this office that this procedure w.ill be consistent with letter from The Adjutant General dated 2 December 1948, subject: Provision for Family Quarters by Private Enterprise for Army Use, file AGAM-PM-620 (23 Nov. 1948) CS GLD/C2 and within the spirit of that letter, this office will initiate negotiations without waiting for the determination of availability.
This letter was forwarded through chain of command from the New York Port of Embarkation to the Commanding Officer of Camp Kilmer, with an indorsement by command of Major General Plank for immediate compliance with the procedure set forth in the letter.
Accordingly, the Commanding Officer of Camp Kilmer by indorsement dated March 5, 1949, requested the Chief of Transportation, Washington, D. C., through the Commanding General, New York Port of Embarkation, that the Kilmer area designated for Kilmer Village, together with existing utilities, be made available for non-military purposes. The existing utilities were described as follows:
6. There remain in these areas, available for use by the lessee, a complete road net and underground utilities, consisting of water distribution system including fire protection and sewage system. The sewers are connected to a low lift pumping station discharging into the Post disposal system and treating plant. Electric distribution system has been removed except for line poles.
After indorsement of approval by the Commanding General, New York Port of Embarkation, the Chief of Transportation *258 in turn indorsed bis approval and forwarded the request to the Director of Logistics, General Staff, U. S. Army.
By indorsement dated March 81, 1949, Col. William D. Evans, acting for Lt. Gen. T. B. Larkin, Director of Logistics, and by order of the Secretary of the Army, notified the Chief of Engineers, Gravelly Point, Virginia, that the designated land at Camp Kilmer was “available for outleasing to private enterprise as a site for construction of housing facilities to accommodate personnel of the Department of the Army.” This advice was promptly communicated to the Division Engineer, North Atlantic Division, and in turn to the New York District Engineer. On May 5, 1949, the District Engineer supplied the Commanding General, New York Port of Embarkation, with a copy of the above-described action of the Secretary of the Army.
26. By letter dated March 2, 1949, Lt. Col. Fischer, for the New York District Engineer, advised the District Director, Federal Housing Administration, Newark, N. J., that the Department of the Army had selected The J. K. Powell Company to construct, operate and manage the Camp Kilmer housing project, “subject to the negotiation of a lease for the use of the land and subject further to approval by the Department of the Army of detailed plans and specifications for the structures, which shall also be approved by financing institutions or agencies.” He further stated as follows:
It is understood that Mr. Powell is interested in obtaining mortgages to be insured under the National Housing Act and that he is in the process of making an application to your agency for such insurance. Details of the proposal, e. g. proposed layout, size of apartments, and auxiliary facilities will be furnished to you directly by Mr. Powell. For your information you are further advised that the site approved by the Department of the Army for construction of the aforementioned rental units consists of the entire area at Camp Kilmer, east of Plainfield Avenue, which area it is believed, can accommodate approximately 1,240 garden type apartments, each two stories in height.
This office has been directed by its higher authority to obtain your concurrence or comments on any lease negotiated for the purpose of providing family quarters by private enterprise for Army use, where it is indicated *259 that financing under the National Housing Act will be requested. It is understood from the aforementioned telephone conversation that your office does not desire to be represented, however, at the initial negotiating conference which is scheduled to be held at this office on 4 March 1949 at 2 P. M. As soon as negotiations progress your office will be contacted again for further discussion of these matters and submission of a lease. In the meantime, there is inclosed herewith for your advance information, a working draft of lease that will form the basis of negotiations in this matter.
It is requested that you investigate the site of the proposed rental project and advise this office concerning its acceptability together with your comments concerning the number of apartments that the area can justify.
27. In early March 1949, the District Engineer’s Office prepared its appraisal report as a basis for establishing the lease rental for the Kilmer site. The appraisal survey included an analysis of the utilities improving the land to be leased by the Army, including water mains, fire hydrants, sanitary sewers, manholes, storm drains, catch basins, roads, culverts, and electric poles. In estimating the rental value, consideration was given to the depreciated value of these utilities installed.
The appraisal report of the New York District Engineer appraiser, dated March 3,1949, was approved by the North Atlantic Division Engineer chief appraiser on March 11, 1949, and forwarded “for review and final approval” to the Chief of Engineers on March 14. This report was approved by order of the Chief of Engineers by indorsement dated March 30, 1949, “for use in establishing an acceptable consideration in the proposed 75-year lease of the land as described.’’ The originally recommended and approved rental rate of $5,250 per annum was revised to the total sum of $5,288 in May 1949, when it was determined that the Kilmer site would have to be divided into three component parts in order to meet certain Federal Housing Administration requirements.
On July 25, 1949, the Chief of Engineers, Washington, D. C., advised the Assistant Secretary of the Army that the appraised rentals were considered adequate.
*260 28. On March 4, 1949, Mr. Powell met at the New York District Engineer’s Office with Lt. Col. Fischer, Executive Officer, and with the civilian chief and also the attorney of the real estate division of the office, as well as representatives of the First Army, New York Port of Embarkation, and the Division Engineer. The District real estate chief announced that Powell associates had been selected as sponsor of the Kilmer housing project, and the attorney of the District real estate division stated that this selection meant that the District Engineer would negotiate for a lease only with Powell associates, not with any other applicant, and that when the lease had been negotiated in a form satisfactory to the District Engineer’s Office, it would be forwarded through channels with the recommendation for ultimate execution by the Secretary of the Army. The “specimen lease” was produced and all of its clauses were discussed in a general way. The preparation of plans and specifications was mentioned. Defendant’s attorney stated that the District Engineer’s Office was not in a position to prepare them and had no funds for such purposes, but that they would have to be prepared by the sponsor of the project.
A memorandum of this March 4,1949, conference was prepared by Mr. L. P. Walker, civilian employee in the North Atlantic Division Engineer’s Office, as follows:
A conference was held at the New York District Engineer Office on 4 March 1949, with J. K. Powell Co., regarding housing at Camp Kilmer, New Jersey. Attending were Colonel Hough, representing Commanding General, First Army, Colonel Gillette, representing Commanding General, NYPE, Lt. Colonel Fischer, representing New York District Engineer, Major Ten-berge, Public Information Officer representing First Army, Mr. Thornton and Mr. Walker, representing Division Engineer, North Atlantic Division, Mr. Tooley and Mr. Pearl, representing New York District Engineer, and Mr. J. K. Powell, representing J. K. Powell Co.
Colonel Gillette indicated that 1,160 officers and men were stationed at Camp Kilmer and are available as tenants.
Colonel Hough estimated that 1,200 units were required and could be justified.
*261 Mr. J. K. Powell explained that the proposed plan contained 1,250 units in all, that it would be developed as 4 units of approximately 300 units each.
Specifications and plans are to be submitted within 3 weeks. These plans and specifications to meet F. H. A., requirements.
Colonel Gillette requested that the general plans be submitted for Army review and approval as to layout and number of different types.
Draft of the lease form was reviewed and accepted generally by Powell.
Dental for use of Government land and improvements was not determined at this time, same to be furnished to Powell on Monday or Tuesday.
Lease to include 93 acres, improved with water, sewer, roads, electricity, and storm water drainage.
It was proposed that lease be executed on or about 9 March 1949.
29. By March 11, 1949, Powell associates had advised the District Engineer that they were not yet ready for further conferences to negotiate a lease because they were endeavoring to reach determinations with respect to financing and the possibility of securing mortgage insurance from the Federal Housing Administration.
On March 21, 1949, a conference was held among representatives of the District Engineer, Division Engineer, and New York Port of Embarkation concerning the proposed leases at both Camp Kilmer and Fort Hamilton. Various changes in the lease form were suggested and agreed upon by the conferees, and it was understood that the District Engineer Office would summarize all corrections into a complete form of lease to be furnished at an early date to the New York Port of Embarkation and First Army, as it would be used in both the Camp Kilmer and Fort Hamilton negotiations. Colonel Gillette, Port Engineer, New York Port of Embarkation, participated in this conference.
30. By letter dated April 1,1949, Lt. Col. Fischer, for the District Engineer, wrote the following letter to Mr. Powell for Powell associates:
Deference is made to proposal submitted by you for the development of a garden apartment project to be erected on Government-owned land to be leased to you for that purpose at Camp Kilmer, N. J.
*262 As indicated in conference you attended at this office on 4 March 1949, you have been selected by the Department of the Army and your proposal approved in principle for the purpose of providing privately owned family housing for Army use at Camp Kilmer, N. J. As indicated in telephone conversations between yourself and Mr. D. S. Tooley of this office, representatives of this office are prepared to continue negotiations for a lease of the land necessary for the above mentioned project.
In the meantime there is inclosed herewith for your information and study a revised draft of the proposed lease. Your comments on the inclosed draft of- lease are requested together with advice from you as to when it will be convenient to resume negotiations.
This revised form of lease furnished to Mr. Powell by this letter bore a revision date of March 30,1949, and was entitled “Specimen Lease”. This form had the same instructions on the first page, as are set forth in finding 10 with respect to the first page of the previous “Specimen Lease.” It also plainly stated that the lease was to be made by the Secretary of the Army, representing the United States of America, pursuant to authority contained in the Act of Congress approved August 5,1947, 61 Stat. 774. This lease form called for execution “by direction of the Assistant Secretary of the Army.”
Copies of this April 1, 1949 letter were furnished to the Division Engineer, New York Port of Embarkation, and First Army Headquarters.
31. Commencing shortly after April 1, 1949, conferences were held between the Powell associates, represented by Mr. Probst and Mr. Powell, and Mr. Milton A. Pearl, attorney, Eeal Estate Division of New York District Engineer’s Office. A detailed examination of the last “specimen lease” resulted in the Powell representatives stating that certain provisions were unacceptable to them, and they prepared and submitted a redraft of the lease to Mr. Pearl. Some changes were made in the terms of the redrafted lease. These changes were accepted by the Powell representatives and by April 27, 1949, a lease form was negotiated which Powell associates were willing to have executed by plaintiff corporations, which lease form was acceptable to the District *263 Engineer’s Office for submission to higher command and to the Secretary of the Army with - a recommendation for approval.
While these negotiations were in progress, Powell associates were contacting Federal Housing Administration officials with respect to F. H. A. requirements, and the F. H. A. District Director’s Office was assisting them because they had indicated that they intended to proceed under F. H. A. rules and regulations in order to secure an F. H. A. insured mortgage.
The plaintiff, Kilmer Village Corporation, was organized on April 22, 1949, but it was determined that there was a certain dollar limit on the amount of housing construction that could be sponsored by any one corporation which expected to secure an F. H. A. insured mortgage. It was then necessary to divide the Kilmer property into three sections for which three separate leases would be required, and also to create two additional corporations in order that each section would be leased by a separate corporation. Plaintiffs, Kil-mer Village Project 2 Corporation and Kilmer Village Project 3 Corporation, were organized on or about April 29, 1949, for such purposes.
By letter dated April 28, 1949, Mr. Convery provided the F. H. A. District Director with a copy of the “proposed lease between the Secretary of the Army and the Kilmer Village Corporation,” and advised that this lease was one agreed upon between the corporation and the New York District Engineer’s Keal Estate Division, “but it is subject to formal approval by the Area Commandant of Governors Island, New York, and the Secretary of the Army at Washington, D. C., as well as the Federal Housing Administration.” Mr. Convery further advised that there would be three leases as it was proposed to divide the property into three sections, that the proposition of having one lease with subleases to three separate corporations had been rejected by the District Engineer’s Keal Estate Division, and that he would shortly submit a sketch showing the divisions of the Kilmer site.
Plaintiffs completed a survey of the Kilmer tract and on May 2, 1949, furnished to the District Engineer’s Office *264 separate descriptions for each of the three sections or parcels into which the tract was to be divided for leasing purposes. In addition, the plaintiffs were required to prepare drawings showing redistribution of the 1,240 apartment units on the three sections, and the rental appraisal by the Corps of Engineers had to be revised to apportion the total rental according to the acreage contained in each parcel.
32. By letter dated April 27,1949, Lt. Col. Fischer, for the District Engineer, advised the Chief of Engineers, Washington, D. C., that after protracted negotiations, the District Engineer’s Office had arrived at what was considered to be an “acceptable lease,” and with concurrence of the Division Engineer submitted advance copies thereof for consideration. He further stated that it was intended to execute three separate leases with the plaintiff corporations, and that as soon as the prospective lessees advised as to the description of each of the three parcels, the exact names of the corporations formed, and the number of housing units of the contemplated total of about 1,200 to be constructed on each parcel, the leases would be “drawn in final form and executed by the lessee.” The letter was concluded with the following statement:
5. Since it is anticipated that this office will be in a position to obtain the execution by the lessee of this lease on or about 4 May 1949, the leases will be executed as drawn unless your office considers some of the provisions now included as being objectionable.
By letter dated April 28, 1949, Lt. Col. Fischer, for the District Engineer, forwarded copies of the negotiated lease form to the Commanding General, New York Port of Embarkation, and the Commanding General, First Army, and stated that “the inclosed draft represents a meeting of the minds that was obtainable to include in principle the provisions that you requested and also to afford to the prospective lessee the protection he deemed necessary.” It was further stated that it was expected that the final form of lease would be drawn within the next week, and after execution by the lessees, submitted through “your Headquarters” for execution by the Assistant Secretary of the Army. Lt. Col. *265 Fischer requested that consideration be given to the lease form in advance of its formal execution and submission.
33. On May 19, 1949, each of the plaintiff corporations executed and delivered to the New York District Engineer’s Office, a separate lease form covering a separate parcel of the Kilmer housing project site, each lease form stating the term to be for 75 years. Each lease contained the provisions which had been negotiated between the plaintiffs and the Real Estate Division of the District Engineer’s Office, advance copies of which had been forwarded by Lt. Col. Fischer to superior commands. On the same day, Lt. Col. Fischer, for the District Engineer, forwarded the leases executed by plaintiffs to the Chief of Engineers, Washington, D. C., through the Division Engineer, the Commanding Officer of Camp Kilmer, the Commanding General of the New York Port of Embarkation, and the Commanding General of the First Army. He recommended that each lease be executed “on behalf of the Assistant Secretary of the Army”, and returned to the District Engineer for further action in accordance with existing regulations.
On May 20 and 21,1949, the Division Engineer, Commanding Officer of Camp Kilmer, Commanding General of the New York Port of Embarkation, and the Commanding General of the First Army approved the provisions of the leases executed by plaintiffs, and recommended to the Chief of Engineers that they be approved and submitted for execution on behalf of the Department of the Army. This transmittal of the leases through the chain of command was in accordance with usual procedure which was considerably expedited in this case.
On May 19,1949, Lt. Col. Fischer, for the District Engineer, wrote the District Director, Federal Housing Administration, Newark, N. J., and advised of the execution of the three leases by plaintiffs, provided copies thereof, and stated that the leases had been forwarded to Washington, D. C., for execution in behalf of the Department of the Army. Lt. Col. Fischer requested the District Director to submit any comments on the leases to the District Engineer in order to permit the inclusion of any modifications necessary to permit the insurance of mortgages desired by the lessees.
*266 The leases executed by the plaintiffs carried identifying contract numbers of the Corps of Engineers: Contract No. W 30-075 eng 4271, Contract No. W 30-075 eng 4272, and Contract No. W 30-075 eng 4273.
34. On May 27, 1949, a review, retreat formation, reception, dinner and dance were held at Camp Kilmer in honor of Major General Plank, who was retiring from the service on May 31.
Before the leases were executed by plaintiffs and during the first week of May 1949, Colonel Gillette, General Plank’s Port Engineer, telephoned Mr. Powell and advised that since General Plank would retire soon, Powell associates and Camp Kilmer would jointly hold a ground-breaking ceremony on the Kilmer housing site on May 27. He explained that it would demonstrate to Kilmer families that the Army was actually going to provide some long-needed housing for them. Mr. Powell met with officers at both the Port base and at Kilmer to complete plans. The Commanding Officer of Camp Kilmer arranged the details of this ceremony.
General Plank had been absent from his command oh official leave in anticipation of his retirement, and upon his return to the Port a few days before the scheduled activities, learned of and expressed objection to the ground-breaking ceremony because the leases had not been executed by the Army. On the recommendation of Col. Gillette, he acquiesced in the arrangements for the ceremony, relying solely upon his authority as Commanding General of the Port.
This ground-breaking ceremony, not related to any commencement of construction, was held on May 27 prior to the other activities in honor of General Plank. In attendance were various staff officers of the First Army, the Port and Kilmer, including among others, the Commanding General of the First Army and the Commanding Officer of Kilmer. General Plank wielded the spade and broke the ground surface. Mr. Powell and Mr. Convery were present with a number of guests they had been permitted to invite, and the assemblage comprised 400 or 500 people including some of the families who expected to occupy the housing units.
35. By letter dated June 23, 1949, prepared and transmitted by order of the Chief of Engineers, the leases which *267 had been executed by plaintiffs, were returned through the North Atlantic Division Engineer to the New York District Engineer. The transmittal letter listed 10 changes which had resulted from top-level conferences between the Federal Housing Administration and the Corps of Engineers at Washington, D. C. The letter further contained the following paragraphs:
3. The majority of changes referred to above were made to satisfy the desires of the Federal Housing Administration. The lease form must be satisfactory to that office before a commitment for the project will be granted. The subject lease was not submitted to the Federal Housing Administration, however, the changes noted therein were made by the Federal Housing Administration in the last lease submitted to it for approval.
4. It is requested that the leases be renegotiated in accordance with the above changes and returned to this office, for transmittal, for approval and execution, as expeditiously as possible.
The Division Engineer instructed the District Engineer by letter dated June 30,1949, to renegotiate the leases with the proposed lessees at the earliest date in accordance with the changes outlined in the letter of the Chief of Engineers, and upon accomplishment thereof, to return the leases to the Division Engineer for transmittal to the Chief of Engineers.
36. During the latter part of 1948 and thereafter until August 24, 1949, Camp Kilmer was a replacement center charged with processing troops going to and returning from Europe. On July 1, 1949, Camp Kilmer became a Class I installation under the jurisdiction of the First Army Commander. Prior thereto, Camp Kilmer was a Class II installation under the jurisdiction of the Chief of Transportation as a subpost of the New York Port of Embarkation. Such classifications concerned the matter of command authority over the Kilmer post.
During the period from December 1948 until the inactivation of the installation in late August 1949, Camp Kilmer was classified as a temporary post. As early as February 17, 1949, Mr. Powell was advised by Major General Plank that Kilmer was classified as temporary.
*268 37. Upon receiving the orders of the Chief of Engineers and Division Engineer returning the leases for further consideration and negotiation with the lessees, Lt. Col. Fischer, for the District Engineer, dispatched the following letter, dated July 6,1949, to Mr. Probst:
Reference is made to previous correspondence and discussions concerning proposal submitted by J. K. Powell Associates, whom you represent, which culminated in the negotiation of referenced leases for the purpose of permitting your group, acting through the Kilmer Village Corporation and other corporate units, to construct a family housing project at Camp Kilmer for the use of Army personnel.
Confirming telephone conversations of 5 July 1949 between Mr. Powell and yourself, and Mr. Pearl of this office, you are advised that the leases as previously executed on your behalf, were submitted by this office for execution on behalf of the Assistant Secretary of the Army and that the Department of the Army at Washington level returned same to this office for negotiation with you based on certain changes desired by both the Department of the Army and the Federal Housing Administration. There is, therefore, inclosed herewith a redraft of a lease incorporating therein all new and modified material for your consideration.
It is understood that you or your representatives will meet with representatives of this office on Tuesday, 12 July 1949, at 2 P. M. at this office for the purpose of further discussing this matter.
Attached to this letter was a memorandum designating with some comments the particular provisions of the leases previously executed by plaintiffs, as to which changes, amendments, and modifications had been “suggested at Washington level by the Federal Housing Administration and Department of the Army.”
Also attached was a redraft of lease which was identical in form and content with the leases executed by plaintiffs on May 19, 1949, with the exception that incorporated therein were the changes, amendments, and modifications proposed at Washington level, as referred to in the memorandum covering the redraft, as well as the communication from the Chief of Engineers, dated June 23,1949.
*269 Such, changes included insertion in provision 8 of language to the effect that the Government would furnish police protection to the housing projects, which had not been included in the leases previously executed by plaintiffs and forwarded to the Chief of Engineers. Some change was made in the language with respect to the previously negotiated terms for the use by plaintiffs of Government-owned sewage disposal facilities.
38. On July 12, 1949, a conference was held at the New York District Engineer’s Office for the purpose of considering the changes, amendments, and modifications suggested at Washington level. Messrs. Powell, Convery, and Probst attended for the plaintiffs; Col. Gillette, Port Engineer, for the New York Port of Embarkation; and Lt. Col. Fischer and the attorney of the civilian real estate division for the District Engineer.
Mr. Probst opposed some of the suggested changes, and Lt. Col. Fischer urged acceptance by plaintiffs of the changes, amendments, and modifications as suggested at Washington level and incorporated in the redraft of lease, without any variation, in order to avoid prolonged negotiations by resubmission of any further changes for reconsideration at Washington, D. C. After considerable discussion, plaintiffs agreed to accept and did accept all of the suggested changes without deviation.
39. On July 18,1949, leases incorporating all of the terms and provisions of the last above-mentioned redraft were executed by plaintiffs and submitted to the District Engineer’s Office.
On the same day, Lt. Col. Fischer, for the District Engineer, wrote to Mr. Probst as follows:
There are inclosed herewith for your information and files, copies of proposed leases with the Kilmer Village Corporation, Kilmer Village Project 2 Corporation and Kilmer Village Project 3 Corporation, executed this day by Mr. Charles Reiss, on behalf of the corporations. The leases contain changes incorporated in the redraft furnished to you by letter of 6 July 1949, from this office and as subsequently agreed upon in conferences held at this office on 12 July 1949 and attended by yourself, as well as Messrs. Powell and Convery on your behalf, Colonel D. H. Gillette of Headquarters, New *270 York Port of Embarkation and Mr. Pearl of this office.
Leases previously executed on behalf of the. above mentioned corporations have been destroyed by this office and the pages of each, containing the signatures of the president and secretary, were delivered to Mr. Reiss this morning.
Immediately upon receipt of advice by this office that the leases have been executed on behalf of the Department of the Army, you will be notified.
Copies of this letter were transmitted to J. K. Powell Associates, the Division Engineer, First Army, and New York Port of Embarkation.
40. By letter dated July 18, 1949, immediately following submission by plaintiffs of the redrafted leases executed by them, Lt. Col. Fischer, for the District Engineer, through the Division Engineer, provided the redrafted leases to and .advised the Chief of Engineers, as follows:
1. In accordance with preceding 7th indorsement, proposed leases for the construction of a housing project by private enterprise for Army use at Camp Kilmer Military Reservation have been renegotiated and reexecuted by the lessee, incorporating therein all of the suggested changes without deviation.
2. Since submission by the preceding 4th indorsement, Camp Kilmer on 1 July 1949 became a Class I installation under the jurisdiction of the First Army Commander. The Commanding Officer of the installation and the First Army Commander have concurred in all of the changes now incorporated in the proposed drafts of leases.
3. It is recommended that the inclosed leases be executed on behalf of the Assistant Secretary of the Army and returned to this office for continuance of action. Exhibits as indicated will be added to the conformed copies of leases when final distribution is accomplished.
41. On July 25,1949, Col. W. H. Hastings, Assistant Chief of Engineers, acting for and in behalf of the Chief of Engineers, dispatched the redrafted leases executed by the plaintiffs to the Pentagon, at Washington, D. C., through the Director of Logistics, General Staff, and through the Judge Advocate General, to the office of the Assistant Secretary of the Army for execution and return to the Chief of Engineers. The transmittal letter provided further as follows:
*271 3. The rentals reserved to the Government in these drafts of instruments are considered adequate. An Appraisal Eeport substantiating such rentals is inclosed.
4. The latest changes required by the Federal Housing Administration are now embodied in these drafts of instrument.
5. The granting of the subject leases will be in the public interest and will promote the national defense.
42. As transmitted by the Chief of Engineers, the redrafted leases were routed first to the Director of Logistics, Army General Staff, in the Pentagon.
On July 27,1949, Col. E. E. Hendrix, Asst. Chief, Service Group, Logistics Division, for the Director of Logistics, routed the redrafted leases forward to the Judge Advocate General, with the following disposition and comment:
1. Eeference is made to the accompanying letter from Headquarters Camp Kilmer to the Commanding General, New York Port of Embarkation, dated 7 February 1949, with eleven indorsements and five inclosures.
2. There is no military objection to leasing land at Camp Kilmer, New Jersey, to the Kilmer Village Corporation, Kilmer Village Project No. 2 Corporation, and Kilmer Village Project No. 3 Corporation in connection with the construction of housing projects to be occupied primarily by military and civilian personnel of the National Military Establishment designated by the Commanding Officer, Camp Kilmer, New Jersey. The consideration reserved is deemed to be adequate.
3. Camp Kilmer, New Jersey, is scheduled to be placed in an inactive status during Fiscal Year 1950, at a date not yet determined. The above projects would not qualify for mortgage insurance under S-1184, the Wherry Bill, which is expected to become law in the immediate future. Prior to the issuance of a commitment by the Federal Housing Administration to insure a mortgage in conformity with the aforementioned bill, the Secretary of Defense or his designee must have certified that the installation to be served by the housing project is deemed to be a permanent part of the Military Establishment and that there is no present intention to substantially curtail activities at such installation.
4. The. family housing shortage in the civilian communities in the Camp Kilmer area have been estimated at 8,000 units according to information furnished by representatives of Headquarters, First Army. There ap *272 pears, therefore, to be an adequate market for the units proposed for construction irrespective of the Army requirements. It is understood from representatives of Headquarters, First Army, that the local insuring office of the Federal Housing Administration has indicated that it would insure a project at Camp Kilmer under Section 608 of the National Housing Act. A project so insured would not require the above-mentioned certificate from the Secretary of Defense.
5. Since Camp Kilmer is planned for retention in an inactive status, the construction of a housing project that could serve a military requirement at the time of reactivation of the installation is desirable.
6. In view of the above, it is recommended that the accompanying draft of leases be executed and returned to the Chief of Engineers for continuation of action after examination and approval by the Judge Advocate General as to form and legal sufficiency.
7. A representative of the lessee, Mr. J. K. Powell,, has been informally advised that the proposed project could not be certified for insurance under S-1184. It is recommended, however, that the Chief of Engineers be directed to so inform the Lessee, in the letter transmitting the signed leases to the Lessee, so that this fact, will be made a matter of official record.
43. On or about July 27, 1949, Mr. Powell visited the Pentagon and inquired of Lt. Col. Lapsley, whose assignment and duties were as set forth in finding 5, as to the status of the leases. Lt. Col. Lapsley informed Mr. Powell that the leases had gone to the Judge Advocate General’s Office to be reviewed for legal sufficiency and then would go to the Office of the Assistant Secretary of the Army for execution. He further stated that he had no reason to believe they would not be executed.
44. On August 1,1949, Lt. Col. Walter O. Beets, Chief of the Lands Division, Judge Advocate General’s Staff, having reviewed the Kilmer Village leases for legal sufficiency, rendered the following opinion:
1. With reference to the inclosed drafts of three leases to Kilmer Village Corporation, Kilmer Village Project No. 2 Corporation, and Kilmer Village Project No. 8 Corporation, New York, New York, for the period of seventy-five years, but subject to prior termination as provided therein, of three tracts of land within the *273 Camp Kilmer Military Reservation, New Jersey, to be used for the purpose of constructing and operating thereon a housing project for primary occupancy by military and civilian personnel of the Army, this office has consistently expressed the view that the Secretary of the Army may not incorporate warranties, covenants or words implying covenants in conveyances of real estate executed by him. With respect to this matter, condition 21 of the drafts of the proposed leases provides that “the lessee shall and may peaceably and quietly have, hold and enjoy the demised premises for the term thereof.” Accordingly, it is the opinion of this office that the aforementioned condition 21 is legally objectionable. When revised so as to eliminate condition 21 the drafts of leases will be in appropriate form and no legal objection is seen to their execution under authority of the act of 5 August 1947 (61 Stat. 774; 10 USC 1270), provided it be deemed that such action will be advantageous to the government and will promote the national defense or will be in the public interest. This office has added an acknowledgment on the last page of each draft of lease.
2. With reference to the method of financing the housing project, this office expresses no opinion as that matter is for determination by the lessee in conjunction with the Federal Housing Administration. In this connection, it is to be noted that if the Federal Housing Administration rejects the lessee’s application for mortgage insurance the lease terminates in accordance with condition 2 thereof.
45. At about this time, Mr. Jouett Shouse, Washington counsel for plaintiffs, made inquiry as to the leases. Lt. Col. Lapsley advised Mr. Shouse that the leases had cleared the Judge Advocate General’s Staff with the statement that they would be legally sufficient when revised to eliminate condition 21, by which the Army would impliedly warrant without authority quiet possession to the lessees. He said that if the plaintiffs would agree to eliminate this clause the leases would then go to the Office of the Assistant Secretary of the Army and that he knew of no reason why they would not be signed.
46. On August 2,1949, the president of each of the three corporations sent the following telegram to the Department of the Army, Attention Lt. Col W. W. Lapsley, Logistics *274 Division, Pentagon Building, Washington, D. C., for the purpose of waiving condition 21 of the leases:
We hereby consent to the elimination of Condition 21 from lease entered into between the Secretary of the Army and ourselves executed by us on the 18th day of July, 1949.
47. The leases were then returned by the Judge Advocate General to the Logistics Division in the Pentagon. On August 4,1949, Col. Hendrix, for the Director of Logistics, cleared the leases for signature by, and delivered them to, the Assistant Secretary of the Army, with this comment:
1. The President of the Kilmer Village Corporation, the Kilmer Village Project No. 2 Corporation and the Kilmer Village Project No. 3 Corporation, New York, New York, has agreed to the elimination of condition 21 in the accompanying drafts of leases as evidenced by a copy of a telegram to the Department of the Army appended to each copy of the lease.
2. In view of the elimination of condition 21 and the opinion of the Judge Advocate General that the accompanying drafts of leases will then be in appropriate form and no legal objection is seen to their execution, it is recommended that these leases be executed and returned to the Chief of Engineers for continuation of action. In addition, it is recommended that the Chief of Engineers be directed to have the lessee authenticate the deletion of condition 21 and to inform the lessee that the proposed project could not be certified for insurance under S. 1184, the Wherry Bill, in the letter transmitting the signed leases to the lessee, so that this fact will be made a matter of official record.
48. Lt. Col. Lapsley had previously told Mr. Powell that the Army would not be able to certify Camp Kilmer as permanent, that the project would have to be financed under section 608 of the National Housing Act, and that the financing might be difficult to obtain. He stated that he found that insurance companies had turned down earlier suggestions that they become sponsors of such projects but later indicated they might take the mortgages if it appeared that the Federal Housing Administration would issue insurance. Mr. Powell informed Lt. Col. Lapsley that the plaintiffs had the financing all arranged and anticipated no difficulty. .
*275 49. On August 8,1949, Col. Harry C. Chuck, by direction of the Secretary of the Army, returned the leases from the Office of the Assistant Secretary to the Director of Logistics, with the following comment:
1. As Camp Kilmer, New Jersey, is scheduled to be placed in an inactive status during this Fiscal Year, it is pointed out that military personnel would be required under the lease to supply utilities, sewage disposal, police protection and other incidental proprietory duties after such inactivation unless other arrangements are made or the lease amended.
2. Prior housing agreements of this type were basically and fundamentally authorized because of the urgency for military housing at the posts involved and, further, were authorized at military establishments which were reasonably forecast as being permanent. In the instant case, it would appear that at such time as the housing would be completed it would be primarily, if not totally, a civilian housing project with the military interests being only for an indefinite future, that is, if and when emergency conditions arose which would necessitate the reactivation of this post.
3. In view of the above, it is considered inappropriate at this time to execute the Camp Kilmer, New Jersey, military housing agreements and, therefore, they are returned without action.
Shortly thereafter, Col. Hendrix, for the Director of Logistics and by order of the Secretary of the Army, returned the leases without execution to the Chief of Engineers and stated that the Secretary of the Army “has indicated that favorable consideration will not be given to leasing any land at Camp Kilmer, New Jersey, in connection with the construction of housing projects.”
50. On August 24,1949, a conference was held in the office of the Secretary of the Army at Washington, D. C., with Secretary of the Army Gordon Gray in attendance. A memorandum of the conference was prepared on September 1,1949, by Col. Hastings, Asst. Chief of Engineers for Real Estate, for the Chief of Engineers, directed to the Director of Logistics, as follows:
1. Reference is made to conference held in the office of the Secretary of the Army on 24 August 1949 attended by Secretary Gray, Brig. Gen. Heiss, Brig. Gen. Brad *276 shaw, Col. Chuck, Lt. Col. Lapsley, and Mr. Blaeuery it was determined due to changes in the situation (Military requirements) and in view of the expenses incurred by J. K. Powell Company in negotiating a lease and preparing for the construction of a housing project at Camp Kilmer, which may result in an inequity to the Company if no lease is granted, that consideration would be given to granting a lease or leases to J. K. Powell Company to use a portion of Camp Kilmer, New Jersey, for the construction of a housing project, assuming that the Army will have the right to recapture or obtain the use of the units of the housing project in the event that the Secretary of the Army determines that such use is necessary, assuming that the land is leased at a fair market rental value, assuming that the lease or leases would involve no cost to the Government or use of Army personnel (that is, utilities would not be furnished by the Army and that necessary arrangements would be made with local authorities to assume police protection), provided that if the fair market rental value is greater than $5,288 per annum, that such rental will be reduced to that amount in the event the Army recaptures or obtains the use of the units. Rental in the amount of $5,288 per annum has been determined to be adequate consideration if the units are leased to personnel designated by the Commanding Officer.
2. The Division Engineer, North Atlantic Division has been requested to negotiate a new lease with the J. K. Powell Company in accordance with the above determination.
Lt. Col. Lapsley testified that the Secretary agreed in this conference that he was willing to continue the negotiations to lease the Kilmer site to the plaintiffs, with the understanding that they would build a section 608 housing project.
51. On September 1,1949, Col. Hastings, by order of the Chief of Engineers, returned the leases to the North Atlantic Division Engineer at New York City. His transmittal letter reported what occurred at the August 24 conference, as set forth in the above-quoted memorandum, and provided further as follows:
3. The above restrictions will require changes in the proposed leases as follows:
a. Paragraph 2 (a) — Since Camp Kilmer has been inactivated the housing project will not be required at the present time for housing military and civilian per *277 sonnel of the Army. In order to justify the proposed grant it is necessary to provide for the use of the housing units by military and civilian personnel of the Army in the event the installation is reactivated or if such use is determined necessary by the Secretary of the Army. Condition No. 3 of the draft of lease submitted to the Federal Housing Administration for approval as to form for grants involving Public Law 211 — 81st Congress, requiring the lessee to lease units to personnel designated by the Commanding Officer, will be sufficient to satisfy this restriction if modified to provide that leases granted to persons other than such personnel will be revocable in the event the Secretary of the Army determines that such use is required for housing such personnel. It is believed that the new lease form will be forwarded in the near future.
b. Paragraph 2 (b) — Higher authority was of the ■opinion that the appraiser may have been influenced by the fact that the lessee was required to lease the units to personnel designated by the Commanding Officer and the desire of the Army to obtain the units for its personnel at as low of rentals as possible. On that basis he .may have determined that the fair market rental value was less than if the housing project would be placed on -the open rental market. Since the Camp was inactivated and the units will be leased to the general public, it was requested that the appraisal be reviewed.
c. Paragraph 2 (c) — It was determined that since the ■Camp was inactivated the lease could not be approved if it would involve any cost to the Government or use of Army personnel even if the lessee agreed to reimburse such costs and pay for services. In view thereof the Army will not furnish any utilities or provide any services such as police or fire protection, garbage removal, etc., even on a reimbursable basis. The utility condition and all other conditions in the lease which may result in a direct or indirect cost to the Government or require the Army to provide service should be modified or eliminated. It is understood that the Army has exclusive jurisdiction over the property except for the -service of process. If such is the case it may be necessary to obtain enabling legislation to transfer sufficient jurisdiction to the State before the local authorities can furnish police protection. The lessee must make arrangements with the local authorities for payment for fire and police protection, garbage collection, etc., if payment for such services is required.
*278 d. Paragraph 2 (d) — This paragraph is self-explanatory.
4. It is requested that new leases be negotiated with the J. K. Powell Company in accordance with the foregoing. It is further requested that a new appraisal be made to determine the fair market rental value of the land involved. In this connection consideration may be given to obtaining the new appraisal by contract.
On September 6, 1949, the Division Engineer indorsed this basic communication, and requested that the District Engineer proceed to negotiate new leases with the “J. K. Powell Company” and that a new appraisal be made to determine the fair market rental value of the areas involved.
52. On September 14,1949, a final conference was held at the real estate office of the New York District Engineer, attended by Messrs. Powell, Probst and Convery for the plaintiffs, Col. Bennett and Lt. Col. Parker of First Army Headquarters, and Messrs. Tooley and Pearl, civilian real estate officials of the District Engineer’s Office.
At this conference the representatives of the District Engineer communicated to plaintiffs’ representatives the orders and directions which had been issued as a result of the Pentagon conference on August 24. Plaintiffs were told that the determination of availability of the Kilmer site for nonmilitary purposes was still in effect, and that the Department of the Army was ready to negotiate a lease at that time with the plaintiffs to permit them to construct a housing project for civilian utilization even though Camp Kilmer was going to inactivate. Plaintiffs’ representatives advised the Army’s conferees that they were not interested in continuing negotiations.
During the summer and fall of 1949, Mr. Powell and Mr. Convery were jointly engaged in submitting proposals to be selected as sponsors of housing projects at Fort Dix and Fort Monmouth.
The offer to continue negotiations for a lease of the Kilmer site was made in good faith by the Department of the Army in view of the time, effort and money expended by plaintiffs and their representations that there was a general housing shortage in the area, and that, even though no military personnel were available from Kilmer, no difficulty would be *279 encountered by plaintiffs in securing tenants from the surrounding Earitan Valley area. In fact, there did exist a housing shortage at this time in the local area about Kilmer of approximately 18,000 units with the demand increasing at a rapid rate due to heavy local industrial expansion.
53. On September 16, 1949, Lt. Col. Fischer, for the District Engineer, executed and transmitted the following letter to the three plaintiff corporations:
Confirming conversations between Mr. J. A. Probst representing your companies and Mr. M. A. Pearl of this office, you are advised that due to changes in military requirements, the Department of the Army no longer has a need for dwelling units to be made available at this time to its personnel at Camp Kilmer and that therefore the leases previously executed on your behalf cannot be executed in their present form on behalf of the Government. Accordingly page 12 of each of the proposed draft of leases executed in quadruplicate by Mr. Charles Eeiss as President and certificated by Miss Lee P. Tann as Secretary of the individual corporation, each in quadruplicate, are returned herewith for your disposal.
In further confirmation of the above conversations and also conversations between Mr. J. K. Powell and Mr. Pearl and discussions at a conference in this office on 14 September 1949 attended by Colonel Bennett and Lt. Colonel Parker, First Army Headquarters, Messrs. Probst,' Powell and Convery of your companies, and Messrs. Tooley and Pearl of this office, you are advised that the Department of the Army would give consideration to the negotiation of a lease for the same area previously considered at Camp Kilmer for the construction of a housing project provided that:
a. The Army would have the right to obtain the use of the units in the event that the Secretary of the Army determines that such use is necessary ;
b. The land is leased at a fair market rental value which would be re-examined and re-negotiated in the light of conditions arising since the tentative negotiation of the leases referred to above; and
c. The lease or leases would involve no cost to the Government nor the use of any Army personnel as a result of which no utilities or services could be furnished to you.
As a result of the above mentioned conversations it is miderstood that you are not interested in negotiating a *280 lease on the above mentioned terms and that unless the military requirements change again you are in a position of withdrawing your application to lease a portion of the Camp Kilmer Military Reservation for housing purposes.
On the same day, a similar letter was executed and transmitted by Lt. Col. Fischer, for the District Engineer, to J. K. Powell Associates, New Brunswick, New Jersey.
54. At the conference held on February IT, 1949, at the New York Port of Embarkation, Major General Plank stated to Mr. Powell that the successful applicant for sponsorship of the Kilmer project should proceed expeditiously.
Between March 1 and August 24,1949, Messrs. Powell and Convery were repeatedly advised by Col. Gillette, Port Engineer, New York Port of Embarkation, and the commanding officers of Camp Kilmer, who in turn were Col. Hayford until May 16, 1949, and thereafter Lt. Col. E. M. Houseman until July 1,1949, that it was important that the Kilmer housing project be expedited. The successive comr manding officers of Kilmer were directly concerned with the welfare of the garrison and stated to Mr. Powell that housing should be provided for post personnel as soon as possible. Col. Gillette and some staff officers at Kilmer repeatedly stated to Mr. Powell and Mr. Convery that they wanted the first section of the project completed for occupancy before cold weather commenced in the fall of 1949.
55. In addition to the site plan, floor plan layouts and outline specifications submitted with and as a part of the January 27,1949 proposal of Powell associates, Mr. Convery and his draftsmen prepared additional site plans and floor plans for each of the three parcels into which the Kilmer site was divided. These drawings were annexed to the three leases executed by plaintiffs on May 19,1949.
Commencing in. March and until August 24, 1949, Mr. Convery and his staff of six or seven draftsmen completed final site plans, elevations, floor and room sections and layouts and about 40 sheets of detailed working drawings for use in construction of Section 1 of the project, the part assigned to Kilmer Village Corporation. These drawings were mainly construction drawings furnishing the details necessary for supervision of builders. Only some prelimi *281 nary work was done on the other two parcels of the Kilmer site. Mr. Powell took various drawings to First Army Headquarters, New York Port of Embarkation, and Camp Kilmer, and reviewed them with the First Army, Port, and Post Engineers, who gave suggestions and criticisms concerning them. Most of the requested changes were minor, but some were of major significance such as the provision of a larger proportion of five-room units in the overall project. The number of five-room units was increased up to 26 percent of the total, with the smaller units being decreased in number. Col. Hough, First Army Engineer, on repeated occasions after execution of the leases by plaintiffs on May 19, 1949, reviewed site plans, floor layouts and architectural details brought to him by Mr. Powell, and discussed technical features of the site, the arrangement of apartments and the architectural treatment of the exterior and the grounds. All changes requested by Army officers were concurred in by Col. Hough of the First Army, Col. Gillette of the Port of Embarkation, and the Commanding Officer of Kilmer, and were included by Mr. Convery and his staff in revised plans and drawings.
Mr. Convery and his staff continued to work on the detailed drawings for Section 1 of the Kilmer Village project until August 24,1949, when plaintiffs learned for the first time that the Department of the Army had decided to close Camp Kilmer. During this period they prepared a total of 526 blueprints of their drawings, which they distributed to the Federal Housing Administration, to consulting engineers, to insurance companies for consideration in connection with mortgage financing, and to the various Army officers contacted by Mr. Powell.
56. Prior to August 24,1949, Messrs. Powell and Convery had engaged a construction superintendent; selected subcontractors for masonry, heating and electricity; consulted plumbing and heating engineers and landscape architects; interviewed material men and advertised for mechanics; contacted labor representatives to make arrangements for engaging employees; prepared data necessary for ordering materials; and discussed with utility companies gas and electric installations.
*282 57. The granting clause of the May 1,9 and July 18, 1949, lease forms executed by plaintiffs provided that the Secretary of the Army leased the described tract to each plaintiff corporation “for a period of seventy-five (75) years, commencing on the date of a commitment from Federal Housing Administration, * * * to be used for the purpose of erecting, maintaining and operating a housing project, * * * substantially in accordance with the outline plans and specifications, * * * attached hereto and made a part hereof and detailed plans and specifications approved by the Commanding Officer, Camp Kilmer Military Eeservation, which approval shall not be unreasonably withheld, and approved by the Federal Housing Administration.”
Within a few weeks after plaintiffs executed the May 19, 1949, lease forms, Mr. Convery completed preparation of and submitted for approval to Col. Gillette, Port Engineer, and to the Commanding Officer of Kilmer, blueprints of plot plan; roof, drainage and grading plan; and unit plans for first and second floors.
In a memorandum dated June 15, 1949, copies of which were supplied to the New York District Engineer and to Mr. Powell, Col. Gillette acknowledged receipt of these plans and stated further as follows:
These are detailed plans required by the lease which are to be approved by the Commanding Officer, Camp Kilmer, in accordance with the second paragraph of the lease, and which upon approval become a part thereof.
2. It is required that you go over these for the Commanding Officer, Camp Kilmer, confer with him and send through this office a letter of approval or suggested changes, and return to this office at your early convenience.
3. Naturally, these plans are not all that is required. The specifications are yet to come and are expected within a week or ten (10) days. The specifications are, at present, incomplete in several basic matters, such as the use of gas or electricity for cooking, etc., etc.
4. It is believed, however, that the drawing as such can be approved without the specifications.
5. In this connection, you are informed that this office has a second copy of these drawings now under study, which copy of these drawings now under study, [sic] which copy will eventually be forwarded to Com *283 manding Officer, Camp Kilmer, for permanent retention, probably in the Post Engineer’s files, as they may be needed from time to time in connection with matters such as utilities.
By letter dated June 29,1949, Lt. Col. Houseman, Kilmer Commanding Officer, advised Mr. Powell in part, as follows:
The review of plans for Kilmer Village, Camp Kil-mer, New Jersey, are in accordance with FELA, housing requirements for projects of this nature and are approved in principle with the following suggestions, that if incorporated, would add to their utility and comfort.
After setting forth several suggestions for improving the plans in various minor aspects, Lt. Col. Houseman .concluded the letter as follows:
8. The plot plan showing the street and layout of buildings has been well done. This is evidenced by the consideration that has been given play areas, drying areas and parking spaces. However, attention is called to the fact that laundries are not shown on these plans. It is assumed that the laundry will be incorporated in the structure housing the Central Heating Plant.
By letter dated July 7, 1949, Mr. Convery replied to Lt. Col. Houseman’s letter, as follows:
Your letter of June 29th, addressed to Mr. J. K. Powell, has been referred to me for attention. I have carefully noted the several points you have raised and will answer them in the order that they are enumerated in your letter.
Your suggestion that outside service doors in lieu of windows be provided on the first floor is one that we would not care to carry out for the following reasons. It interferes with the space in the kitchen definitely allocated for heating. It would make it necessary to provide a flight of several steps to the grade as the grade in the rear of the building in most cases will be much lower than at the front. It would also make it necessary to have connecting cement walks from the rear steps to the walks which lead to the front of the building. It would intensify the maintenance problem and confusion would exist on the part of tradesmen and delivery schedules as they would be servicing both the front and rear of the same buildings.
Your comment with reference to access panels for valves, fittings, etc., this would be taken care of in the *284 plumbing layout and in the specifications covering the plumbing work.
We do not believe that Unit E requires an entrance vestibule. An outside vestibule would be rather bulky and an inside vestibule would interfere with the space required for the stair going to the second floor. Inasmuch as both the first and second floors have separate entrances and the doors are well weatherstripped we do not believe it will be required.
With reference to your comment on Unit F, the closets can be located at the opposite end of the room and eliminate the conflict between the two doors.
The kitchen in Unit G will be restudied with a view of eliminating the door hazard which now exists. I am quite sure this can be done to meet with your approval.
With reference to Unit B your suggestion is a good one and a window will be installed which will light up the stairway.
With reference to Unit E I believe with a sash door at the first floor and the fact the stairway opens into an open hallway on the second floor, you will find, sufficient light is provided for this stairway. To install a window in any portion of this stair well would interfere materially with the closet space on the second floor.
I wish to take this opportunity to thank you for your comments and particularly your evident pleasure in the overall layout. You are entirely right that where laundry rooms cannot be provided in basement spaces, they will be built in conjunction with the storage rooms and boiler rooms and the utility buildings located in the yard spaces.
Within a very short time we will have a general outline specification of all the work ready and will forward copies to you. As the plans progress further detailed drawings and general assembly plans will also be forwarded to you.
Looking forward to sitting down and going over these-with you personally, I am
Mr. Convery thereafter prepared detailed outline specification on FHA Form No. 2435-W, which was required to be filed with an application for insurance for section 608 housing project, and a copy of this specification form was informally submitted to the Federal Housing Administration and?, to the Army.
*285 58. Condition 2 of tbe May 19 and July 18, 1949, lease forms executed by plaintiffs, provided in part:
That the required plans and specifications shall be submitted by the Lessee to the Federal Housing Administration for approval within sixty (60) days after the final execution of this lease. That the construction of the housing project shall be commenced within one hundred and eighty (180) days after the effective date of this lease.
After Mr. Convery had supplied a copy of the lease form to the District Director, Federal Housing Administration, on April 28,1949, as related in finding 31, Mr. Convery proceeded to have an engineer prepare a cross-section drawing to show elevations and actual ground conditions for use by Mr. Convery in preparing plans for foundations, basements, and first floors. By May 10, Mr. Convery submitted to the Chief Underwriter of the Federal Housing Administration’s Newark District Office a blueprint of the units to be constructed at Kilmer; a rough outline of the site plan showing the walks, steps and grading; a blueprint of grade and profile; and an overall site plan. Prior to these submissions, plaintiff proceeded to have test pits dug on the Kilmer site, and by letter dated May 10, 1949, Mr. Convery advised the FHA District Office as follows:
We have had two test pits dug in the section which is entirely surrounded by roads and which is the lowest section of the site and we find the following:
Topsoil 6"
Sand and gravel approximately 30"
Loose shale 1'
Clay 6 to 8"
Hardpan
At no time during the digging of these pits did we discover what could be called a “water table’’. No doubt water will lay on top of the shale strata after a very heavy rainstorm but evidently this drains off as these test pits were made two days after a fairly heavy rainstorm. We believe that when the present drainage lines are thoroughly cleaned, new lines installed and the new ditch on the upper eastern portion and the southern boundary of the property is installed which will carry the excess water to the existing brook, we will not have any further trouble.
*286 Plaintiffs also made test excavations five or six feet deep at the site of every footing and foundation provided in plans for Section 1 of the Kilmer project.
Subsequently, between May 19 and August 24, 1949, Mr. Convery submitted to the FHA District Office the layout plans and detailed architectural drawings for criticism and review, as they were prepared and developed. Messrs. Con-very and Powell had many conferences over this period with the District FHA officials, as a result of which the detailed drawings were revised and the detailed outline specifications on the FHA form carefully reviewed and considered to be satisfactory. Mr. Convery and his staff were still working on five of the 40 detailed drawings for Section 1 when the architectural work was stopped on August 24, 1949.
59. Condition 2 of the lease forms executed by plaintiffs also further provided:
* * * In the event that the Federal Housing Administration fails to find a need for a substantial number of the * * * units proposed for construction under this Lease or rejects or fails to act on the application for mortgage insurance within twelve (12) months from the date of final execution of this lease, a termination shall thereby be effected at the sole option of the Government * * *.
No application was ever filed by any proposed mortgagee of the Kilmer housing project for issuance by Federal Housing Administration of mortgage insurance. Submission of such an application was necessary before the FHA could make a commitment. Before such an application could be filed by a mortgagee in behalf of plaintiffs, it was necessary that the leases be executed by the Department of the Army as well as plaintiffs.
From all of the evidence in this case, it is clear that the plaintiffs and the District FHA officials fully understood in their negotiations that they were engaging in pre-application processing.
The FHA District Office opened files preliminary to applications and assigned file numbers to the three sections of the proposed Kilmer housing project. Plaintiffs followed the advice and procedures suggested by the District FHA officials, and supplied all requested details and information.
*287 The District FHA officials advised plaintiffs orally that they were willing to insure a mortgage on the basis of the preliminary showing made.
Plaintiffs had numerous discussions with representatives of life insurance companies and of other lending institutions concerning financing of the Kilmer project by mortgage* Competition for this business was active, and several companies had offered premiums varying from 3 to 5 percent on a mortgage insured by Federal Housing Administration.
60. Condition 3 of the May 19 and July 18 lease forms executed by plaintiffs provided in part as follows:
If a mortgage is insured under the National Housing Act covering the interest of the Lessee, and in connection therewith a rent schedule is approved from time to time by the Federal Housing Commissioner, such approved rent schedule shall be, for so long as any such mortgage remains insured under the National Housing Act, the rent schedule for leases granted in accordance with this Condition 3. * * *
Plaintiffs’ proposed rent schedules were discussed by them with the District FHA officials, who indicated approval thereof.
61. No lease for the Camp Kilmer site was ever consummated between the plaintiffs and the Department of the Army. The officers and other personnel of the Department of the Army with whom plaintiffs’ representatives had conferences and negotiations did not have authority to contract to compensate plaintiffs for any work or services performed and expenditures or costs incurred in connection with the proposed housing on the Camp Kilmer site. The plaintiffs proceeded in good faith with plans, drawings and arrangements necessary to commence construction at the earliest date possible because they believed that execution of the leases by or at the direction of the Secretary of the Army was certain, and not in expectation that they would be compensated for work performed, and costs incurred in the event that no lease was ever accomplished.
62. The 1,240 housing units of the entire Kilmer housing project were distributed by the terms of the approved site plans — 554 units to the Section 1 area proposed to be leased to Kilmer Village Corporation, 350 units to Section 2 for *288 Kilmer Village Project 2 Corporation, and 336 units to Section 3 for Kilmer Village Project 3 Corporation.
Mr. Convery testified on the basis of his experience and knowledge of existing costs that he estimated that the overall cost, excluding overhead and profit, of the entire project as planned by plaintiffs would amount to $8,950 per unit, which would amount to $4,958,300 for the 554 units on Section 1; $3,132,500 for the 350 units on Section 2; and $3,007,-200 for the 336 units on Section 3, or a total of $11,098,000 for the total of 1,240 units.
Mr. Convery further testified that the customary and fair and reasonable gross profit, which would include overhead and net profit, on a project the size of the combined Kilmer housing proposal, would amount to 10 percent of the gross costs before overhead and profit. He further testified that the share of the gross profit which would be expended for overhead, such as for general supervision by a superintendent and others, field engineers and staffs, timekeeper and office expense for purchasing and accounting, would amount to 4 percent, leaving a net profit of 6 percent of the gross costs before overhead.
In this manner, plaintiffs claim damages for loss of anticipated profits on the construction of the sections of the Kil-mer housing project as follows: Section 1, Kilmer Village Corporation, 6 percent of $4,958,300, or $297,498; Section 2, Kilmer Village Project 2 Corporation, 6 percent of $3,132,-500, or $187,950; and Section 3, Kilmer Village Project 3 Corporation, 6 percent of $3,007,200, or $180,432. The total loss of anticipated construction profits would thus amount to $665,880.
63. The rent schedules proposed by plaintiffs, as approved by Army officers and District FHA officials to the extent set forth in the preceding findings, provided for rentals averaging $18.78 per room per month for the 5,100 rooms contained in the 1,240 units, thus providing for a maximum rental of $95,778 per month, or $1,149,336 per year. In addition, the plaintiffs’ same rent schedules provided for rental of the 500 planned garages at $5.00 per month each, or a total of $2,500 per month, or $30,000 per year.
*289 The maximum total rentals which plaintiffs could have received under their rental schedules would have amounted to $1,179,386 per year.
64. The civilian demand for housing in 1949 in the Earitan Valley about Camp Kilmer was such that-it is reasonable to conclude that the Camp Kilmer housing project, upon completion, could have operated with full occupancy by local residents not connected with any military establishment. Plaintiffs’ proposed rentals would have been the lowest prevailing in the area.
During the five-year period 1949-1954 there were 3,285 new apartment units developed in the Earitan Valley within a radius of 5 miles of the Camp Kilmer site, at a total cost of $41,500,000. In the same period new industrial plant construction in the same area totaled about $224,250,000, and industrial employment increased from 51,000 to 78,000.
During the same period, there were practically no vacancies in garden apartments within five miles of the Kilmer site, with the rentals on about 2,500 new family units ranging from $22 to $28 per room per month for apartment space comparable to that planned for the Kilmer housing project.
An experienced real estate broker, who had operated his business in the Earitan Valley area for 35 years, testified in behalf of plaintiffs, that plaintiffs’ rent schedules would have been the lowest prevailing in the area, that no vacancies existed in comparable housing in the period 1949-1954, and that in the light of the actual experience of those five years, a reasonable forecast would be ten years of full occupancy of the Kilmer Village units beyond the expected completion of construction in early 1950.
Plaintiffs through the testimony of Mr. Powell conceded an arbitrary vacancy allowance of 5 percent of the gross annual rents. On the assumption that plaintiffs would have received gross annual rental in the sum of $1,179,336, computed as set forth in finding 63, and with a 5 percent adjustment as a vacancy allowance, which would amount to $58,966.80, plaintiff’s adjusted gross annual rental income would amount to $1,120,369.20.
65. Based upon his actual experience in projecting the expenses of multiple-unit housing projects, and upon the *290 access be bad bad to audited operating income and expense records in connection with market-value appraisals of such projects, Mr. Powell testified that the per-room cost of maintaining and operating the Kilmer Village project would amount to $52.50 per year, comprising $16 for beat, $0.25 for electricity, $2 for water, $2.75 for insurance, $10.50 for decorating, $4.60 for repairs, $8.50 for replacements, $0.50 for legal and audit fees, and $7.40 for operating personnel.
Applied to the 5,100 rooms of the planned Kilmer Village project, plaintiffs’ operating costs at a rate of $52.50 per room per year,- would have amounted to $267,750, which together with the annual ground rental of $5,288 would have totaled $273,038 per year.
66. Mr. Powell further testified that in 1949 the Federal Housing Administration would allow $1,800 to $2,200 per room in determining the permissible amount of mortgage insurance on a housing project erected pursuant to section 608 of the National Housing Act, depending upon the facilities, specifications, size of rooms and number of baths in the total project, with neither bathrooms nor kitchens being counted for such purposes. He further testified that for the 5,100 rooms of the total Kilmer project, at an estimated average of $2,100 per room, the total cost of the project would be $10,710,000 for the apartment buildings, $250,000 for garages' and $100,000 for site improvement. He further testified that addition of architectural fees and overhead according to “a formula that is used by FHA” would make the total Kilmer project cost $11,560,000.
Mr. Powell further testified that the Kilmer project would have qualified for a mortgage at 90 percent of the $11,560,000, or for about $10,400,000. He further testified that the personnel of the District Office of Federal Housing Administration had agreed to insure a mortgage on a “constant rate” rate of interest payment of 6 percent per annum, made up of 4 percent interest, 1.5 percent amortization, and 0.5 percent for FHA insurance. Plaintiffs apply this 6 percent rate to the sum of $10,400,000 to determine that the Kilmer cost for amortization, interest and mortgage insurance would have been $624,000 per annum.
*291 Plaintiffs then add to this annual item of $624,000 the prospective annual operating expenses, which amount to the sum of $273,038 as computed in finding 65, to arrive at the total annual expenditure for the operation of the project in the sum of $897,038.
By subtracting $897,038 from the adjusted gross annual rental income, or from the sum of $1,120,369.20 as computed in findings 63 and 64, plaintiffs arrive at their prospective annual net yield, which, on the basis of the foregoing computations, would amount to $223,331.20, which is reduced by plaintiffs on the basis of round-figure computations to $222,000.
On a 10-year basis claimed by plaintiffs, the annual net yield of $222,000 would amount to $2,220,000 for the first 10 years of operation, which total sum plaintiffs request be distributed among them as follows: Kilmer Village Corporation, 554 planned housing units, $991,860; Kilmer Village Project 2 Corporation, 350 units, $626,600; and Kilmer Village Project 3 Corporation, 336 units, $601,540.
67. Plaintiffs’ claimed damages for loss of anticipated construction profits and also for loss of prospective profits in the operation of the Kilmer Village housing project are highly speculative and not capable of reasonable approximation or ascertainment.
68. Plaintiffs claim damages on account of the work labor and services performed and expenses incurred by Messrs. Powell, Convery and Probst in connection with the subject matter of this case.
In early February 1949, when Messrs. Powell, Convery and Probst agreed to engage together in the joint venture of submitting a proposal for construction, ownership and management of the Kilmer housing project, they agreed that if Mr. Convery were to act as architect and receive full fees, and if Mr. Powell were to receive full compensation for services rendered up to the completion of construction, then neither should participate in the project thereafter, and accordingly they agreed that Convery and Powell would charge fees “for below what was normal, what was current for those services, and that their interest in the project and the part they would play in it and the compensation they *292 would receive when the project was completed for the work they did thereafter would more than compensate them for the loss they took in acting as architect, for Neil Convery, and King Powell in performing the services during this time.”
Mr, Convery agreed with Mr. Probst and Mr. Powell in their February 1949 conference that Convery would do the architectural planning and supervision for a fee of “slightly higher than 1 percent” of the total cost of the project, with the understanding that he would be retained as the operating manager of the housing project. Mr. Convery represented to his associates that the normal architect’s fees on a housing project like Kilmer Village would be from 3% to 4 percent of the total cost.
With respect to Mr. Powell, it was understood that he would continue to negotiate with Army officials and other personnel representing the Government, for which he would be reimbursed his actual expenses and $50 per day for the time he spent, and that after the project was completed, he would handle the renting.
There is no showing that this arrangement was ever changed by them, or that any definitive understanding was ever reached between or among Messrs. Powell, Convery, and Probst and the three plaintiff corporations with respect to reimbursement of expenses or compensation for services rendered in connection with the venture. They all had the firm belief until August 24, 1949, that the project would be completed, and never considered that the leases would not be executed by the Department of the Army.
69. Mr. Convery’s part in the construction of the proposed Kilmer Village housing project was to prepare all plans, drawings and specifications, engage in selection of subcontractors and in the awarding of the subcontracts, and conduct the general architectural supervision of construction.
The recognized and generally accepted fee approved by the American Institute of Architects for a project of the character of the planned Kilmer Village was 6 percent of the total construction cost, reduced to a lesser percentage where there was a considerable duplication of units. A fair and reasonable fee for architect’s services on the planned *293 Kilmer Village project would have been 3% to 4 percent. The recommended and generally accepted division of the fee approved by the American Institute of Architects is 75 percent for all plans and specifications, together with engagement of and consultation with technical engineers and landscape architects, and 25 percent for general architectural supervision of the construction.
70. With respect to Section 1 of the Kilmer Village housing project, that part assigned to Kilmer Village Corporation, which section was planned for 554 apartment units, and on the basis of an estimated average cost of $8,950 per unit totaling $4,958,300 for all 554 units, including facilities, roads and other improvements, the total architectural fee for all planning and architectural supervision of construction would reasonably have been Sy2 percent of the total cost, or the sum of $173,540. Since no construction was actually involved, this fee would be reduced to 75 percent thereof, or the sum of $130,155. Mr. Convery’s work on the drawings and specifications for Section 1 was about 45 percent complete when all work was stopped on August 24, 1949. The fair and reasonable charges for his work and services on Section 1 would be $58,570.
With respect to Section 2 of the Kilmer Village housing project, that part assigned to Kilmer Village Project 2 Corporation, which section was planned for 330 units and increased to 350 units, and on the basis of an estimated cost of $8,950 per unit totaling $2,953,000 on 330 units, including facilities, roads, and other improvements, the total architectural fee for all planning and architectural supervision of construction would reasonably have been 3y2 percent of the total cost, or $103,372. Since no construction was actually involved, this fee would be reduced to 75 percent thereof, or $77,529. Mr. Convery’s completed work on Section 2 consisted of preliminary studies and drawings and site plans which comprised about 10 percent of the total planning work and services, and the fair and reasonable charges for his work and services on Section 2 would be $7,753.
With respect to Section 3 of the Kilmer Village housing project, that part assigned to Kilmer Village Project 3 *294 Corporation, which section was planned for 316 units and increased to 336 units, and on the basis of an estimated cost of $8,950 per unit totaling $2,828,200 on 316 units, including facilities, roads and other improvements, the total architectural fee for all planning and supervision of construction would reasonably have been 3% percent of the total cost, or $98,987. Since no construction was actually involved, this fee would be reduced to 75 percent thereof, or $74,240. Mr. Convery’s completed work on Section 3 consisted of preliminary studies and drawings and site plans which comprised about 10 percent of the total planning work and services, and the fair and reasonable charges for his work and services would be $7,424. • ••
By three separate letters dated November 7, 1949, Mr. Convery submitted claims to each of the three plaintiff corporations for his work and services in the amounts as above computed.
71. During the period from January 1, 1949, to August 24, 1949, Mr. Convery expended in his office in work on the Kilmer Village project the sum of $1,484 in draftsmen’s salaries and $1,191 in office overhead expense, or a total of $2,675.
72. Mr. Powell, during the period from late December 1948 to August 24, 1949, made cash disbursements in connection with the Kilmer Village project in the total sum of $2,245.08 covering printing, photographing, railroad and automobile transportation, stenographic and clerical help and other office expenses. In addition, he devoted 53 days of his personal time which at a rate of $50 per day would amount to $2,650.
By letter dated October 26, 1949, addressed to Mr. Con-very, Mr. Powell submitted his claims in the above stated amounts, stating that they were presented following “our several recent meetings with Mr. Probst.” Mr. Convery presented this letter to Mr. Probst.
Neither Mr. Convery nor Mr. Powell has been paid any part of their claims except that Mr. Powell was reimbursed to the extent of $55.40 by a personal contribution from Mr. Probst.
*295 73. At the instance of Mr. Powell, Mr. Raymond Wilson, a surveying engineer, was retained and conducted a topographical survey and prepared a map of the Kilmer site, preliminary to Mr. Convery’s detailed planning of the Kil-mer project. His bill for a reasonable fee of $750 was presented to Mr. Convery who in turn submitted it to Mr. Probst. Mr. Probst advanced the necessary funds to Mr. Convery, who in turn paid the $750 to Mr. Wilson by personal check.
74. The law firm of Kessler & Kessler, Newark, New Jersey, was retained at the instance of Mr. Probst, for the organization of plaintiff corporations, and was paid with funds advanced by Mr. Probst the reasonable fee of $849, allocable $283.33 to each corporation, for such services.
Plaintiffs’ claim for an additional fee payable to Kessler & Kessler in the sum of $11,500 for alleged services rendered is not supported by substantial evidence, nor is the claim for allocation to plaintiff corporations of $33,000 of the alleged $125,000 overhead of Mr. Probst’s office where he supervised his various corporations.
CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiffs are not entitled to recover and their petition is therefore dismissed.